MORALES, ATTORNEY GENERAL OF TEXAS *v.*
TRANS WORLD AIRLINES, INC., ET AL.

No. 90–1604.   Argued March 3, 1992—Decided June 1, 1992

SCALIA, J., delivered the opinion of the Court, in which WHITE, O'CON-
NOR, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting
opinion, in which REHNQUIST, C. J., and BLACKMUN, J., joined, *post*, p. 419.
SOUTER, J., took no part in the consideration or decision of the case.

*Stephen Gardner*, Assistant Attorney General of Texas, ar-
gued the cause for petitioner. With him on the briefs were
*Dan Morales*, Attorney General of Texas, *pro se*, *Will Pryor*,
First Assistant Attorney General, and *Mary F. Keller*, Dep-
uty Attorney General.

*Keith A. Jones* argued the cause for respondents. With
him on the brief for respondent airlines were *David Wilks
Corban*, *Andrew C. Freedman*, and *Ronald D. Secrest*. A
brief for 31 State Attorneys General, respondents under this
Court's Rule 12.4, in support of petitioner was filed by *Dan-
iel E. Lungren*, Attorney General of California, *Roderick E.
Walston*, Chief Assistant Attorney General, *Herschel T. Elk-
ins*, Senior Assistant Attorney General, and *Albert Norman*

*Sheldon,* Deputy Attorney General, *Scott Harshbarger,* Attorney General of Massachusetts, and *Ernest L. Sarason, Jr.,* Assistant Attorney General, *Hubert H. Humphrey III,* Attorney General of Minnesota, and *David Woodward,* Special Assistant Attorney General, *Robert Abrams,* Attorney General of New York, and *Ronna D. Brown* and *Andrea C. Levine,* Assistant Attorneys General, *Charles Cole,* Attorney General of Alaska, and *James Forbes,* Assistant Attorney General, *Grant Woods,* Attorney General of Arizona, and *Carmen D. Claudio,* Assistant Attorney General, *Gale A. Norton,* Attorney General of Colorado, and *Garth C. Lucero,* First Assistant Attorney General, *Richard Blumenthal,* Attorney General of Connecticut, and *Robert M. Langer,* Assistant Attorney General, *Robert A. Butterworth,* Attorney General of Florida, and *Richard F. Scott,* Assistant Attorney General, *Larry EchoHawk,* Attorney General of Idaho, and *Brett T. Delange,* Deputy Attorney General, *Roland W. Burris,* Attorney General of Illinois, and *Deborah Hagen,* Assistant Attorney General, *Bonnie J. Campbell,* Attorney General of Iowa, and *Steve St. Clair,* Assistant Attorney General, *Robert T. Stephan,* Attorney General of Kansas, and *Dan Kolditz,* Deputy Attorney General, *J. Joseph Curran, Jr.,* Attorney General of Maryland, and *Vincent Demarco,* Assistant Attorney General, *Frank J. Kelley,* Attorney General of Michigan, and *Frederick H. Hoffecker,* Assistant Attorney General, *William L. Webster,* Attorney General of Missouri, and *Clayton S. Friedman,* Assistant Attorney General, *Don Stenberg,* Attorney General of Nebraska, and *Paul N. Potadle,* Assistant Attorney General, *Frankie Sue Del Papa,* Attorney General of Nevada, and *Philip R. Byrnes,* Deputy Attorney General, *Lacy H. Thornburg,* Attorney General of North Carolina, and *K. D. Sturgis,* Assistant Attorney General, *Nicholas J. Spaeth,* Attorney General of North Dakota, and *David W. Huey,* Assistant Attorney General, *Lee Fisher,* Attorney General of Ohio, and *Mark T.*

*D'Alessandro*, Assistant Attorney General, *Susan B. Loving*, Attorney General of Oklahoma, and *Jane F. Wheeler*, Assistant Attorney General, *Charles Crookham*, Attorney General of Oregon, *Virginia Linder*, Solicitor General, and *Michael Reynolds*, Assistant Attorney General, *James E. O'Neil*, Attorney General of Rhode Island, and *Terrance Hassett* and *Lee Baker*, Special Assistant Attorneys General, *Mark W. Barnett*, Attorney General of South Dakota, and *Jeffrey P. Hallem*, Assistant Attorney General, *Charles W. Burson*, Attorney General of Tennessee, and *Charlotte H. Rappuhn*, Assistant Attorney General, *Jeffrey L. Amestoy*, Attorney General of Vermont, and *J. Wallace Malley, Jr.*, Assistant Attorney General, *Kenneth O. Eikenberry*, Attorney General of Washington, and *Robert F. Manifold*, Assistant Attorney General, *Mario J. Palumbo*, Attorney General of West Virginia, and *Don Darling*, Deputy Attorney General, *James E. Doyle*, Attorney General of Wisconsin, and *James D. Jeffries* and *Barbara Tuerkheimer*, Assistant Attorneys General, and *Joseph B. Meyer*, Attorney General of Wyoming, and *Mark Moran*, Assistant Attorney General.

*Stephen L. Nightingale* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Roberts, Assistant Attorney General Gerson, Robert V. Zener, Robert D. Kamenshine*, and *Arthur J. Rothkopf*.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Hawaii et al. by *Warren Price III*, Attorney General of Hawaii, and *Girard D. Lau* and *Steven S. Michaels*, Deputy Attorneys General, and by the Attorneys General for their respective States as follows: *James H. Evans* of Alabama, *Linley E. Pearson* of Indiana, *Richard P. Ieyoub* of Louisiana, *Mike Moore* of Mississippi, *Robert J. Del Tufo* of New Jersey, *Tom Udall* of New Mexico, *Ernest Preate, Jr.*, of Pennsylvania, *Paul Van Dam* of Utah, and *Mary Sue Terry* of Virginia; and for the Public Citizen and Aviation Consumer Action Project by *Cornish F. Hitchcock* and *Alan B. Morrison*.

Briefs of *amici curiae* urging affirmance were filed for American Airlines, Inc., by *Steven C. McCracken* and *Jane G. Allen;* for the American

JUSTICE SCALIA delivered the opinion of the Court.

The issue in this case is whether the Airline Deregulation Act of 1978, 49 U. S. C. App. § 1301 *et seq.*, pre-empts the States from prohibiting allegedly deceptive airline fare advertisements through enforcement of their general consumer protection statutes.

I

Prior to 1978, the Federal Aviation Act of 1958 (FAA), 72 Stat. 731, as amended, 49 U. S. C. App. § 1301 *et seq.*, gave the Civil Aeronautics Board (CAB) authority to regulate interstate airfares and to take administrative action against certain deceptive trade practices. It did not, however, expressly pre-empt state regulation, and contained a "saving clause" providing that "[n]othing . . . in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 49 U. S. C. App. § 1506. As a result, the States were able to regulate intrastate airfares (including those offered by interstate air carriers), see, *e. g.*, *California* v. *CAB*, 189 U. S. App. D. C. 176, 178, 581 F. 2d 954, 956 (1978), cert. denied, 439 U. S. 1068 (1979), and to enforce their own laws against deceptive trade practices, see *Nader* v. *Allegheny Airlines, Inc.*, 426 U. S. 290, 300 (1976).

In 1978, however, Congress, determining that "maximum reliance on competitive market forces" would best further "efficiency, innovation, and low prices" as well as "variety [and] quality . . . of air transportation services," enacted the Airline Deregulation Act (ADA). 49 U. S. C. App. §§ 1302(a)(4), 1302(a)(9). To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision, prohibiting the States from enforcing any law "relating to rates, routes, or

Association of Advertising Agencies, Inc., by *David S. Versfelt* and *Valerie L. Schulte;* and for the Association of National Advertisers, Inc., by *Burt Neuborne* and *Gilbert H. Weil.*

services" of any air carrier. § 1305(a)(1). The ADA retained the CAB's previous enforcement authority regarding deceptive trade practices (which was transferred to the Department of Transportation (DOT) when the CAB was abolished in 1985), and it also did not repeal or alter the saving clause in the prior law.

In 1987, the National Association of Attorneys General (NAAG), an organization whose membership includes the attorneys general of all 50 States, various Territories, and the District of Columbia, adopted Air Travel Industry Enforcement Guidelines (set forth in an Appendix to this opinion) containing detailed standards governing the content and format of airline advertising, the awarding of premiums to regular customers (so-called "frequent flyers"), and the payment of compensation to passengers who voluntarily yield their seats on overbooked flights. These guidelines do not purport to "create any new laws or regulations" applying to the airline industry; rather, they claim to "explain in detail how existing state laws apply to air fare advertising and frequent flyer programs." NAAG Guidelines, Introduction (1988).

Despite objections to the guidelines by the DOT and the Federal Trade Commission (FTC) on pre-emption and policy grounds, the attorneys general of seven States, including petitioner's predecessor as attorney general of Texas, sent a memorandum to the major airlines announcing that "it has come to our attention that although most airlines are making a concerted effort to bring their advertisements into compliance with the standards delineated in the . . . guidelines for fare advertising, many carriers are still [not disclosing all surcharges]" in violation of § 2.5 of the guidelines. The memorandum said it was the signatories' "purpose . . .. to clarify for the industry as a whole that [this practice] is a violation of our respective state laws on deceptive advertising and trade practices"; warned that this was an "advisory memorandum before [the] initiati[on of] any immediate enforcement actions"; and expressed the hope that "protracted

litigation over this issue will not be necessary and that airlines will discontinue the practice . . . immediately." Memorandum from Attorneys General of Colorado, Kansas, Massachusetts, Missouri, New York, Texas, and Wisconsin, dated February 3, 1988 (Exhibit A to Exhibit H to Motion for Temporary Restraining Order), App. 123a, 125a. Several months later, petitioner's office sent letters to several respondents serving "as formal notice[s] of intent to sue." Letter from Assistant Attorney General of Texas, dated November 14, 1988, App. 115a.

Those respondents then filed suit in Federal District Court claiming that state regulation of fare advertisements is pre-empted by § 1305(a)(1); seeking a declaratory judgment that, *inter alia*, § 2.5 of the guidelines is pre-empted; and requesting an injunction restraining Texas from taking any action under its law in conjunction with the guidelines that would regulate respondents' rates, routes, or services, or their advertising and marketing of the same. The District Court entered a preliminary injunction to that effect, determining that respondents were likely to prevail on their pre-emption claim. *Trans World Airlines, Inc.* v. *Mattox*, 712 F. Supp. 99, 101–102 (WD Tex. 1989). (It subsequently extended that injunction to 33 other States, *id.*, at 105–106; the propriety of that extension is not before us.) The Court of Appeals affirmed. *Trans World Airlines, Inc.* v. *Mattox*, 897 F. 2d 773, 783–784 (CA5 1990). Subsequently, the District Court, in an unreported order, permanently enjoined the States from taking "any enforcement action" which would restrict "any aspect" of respondents' fare advertising or operations relating to rates, routes, or services. The Court of Appeals once again affirmed. 949 F. 2d 141 (CA5 1991). We granted certiorari. 502 U. S. 976 (1991).

## II

Before discussing whether § 1305(a)(1) pre-empts state enforcement of the challenged guidelines, we first consider

whether, assuming that it does, the District Court could properly award respondents injunctive relief. It is a "'basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.'" *O'Shea* v. *Littleton*, 414 U. S. 488, 499 (1974); *Younger* v. *Harris*, 401 U. S. 37, 43–44 (1971). In *Ex parte Young*, 209 U. S. 123, 156 (1908), we held that this doctrine does not prevent federal courts from enjoining state officers "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution." When enforcement actions are imminent—and at least when repetitive penalties attach to continuing or repeated violations and the moving party lacks the realistic option of violating the law once and raising its federal defenses—there is no adequate remedy at law. See *id.*, at 145–147, 163–165.

We think *Young* establishes that injunctive relief was available here. As we have described, the attorneys general of seven States, including petitioner's predecessor, had made clear that they would seek to enforce the challenged portions of the guidelines (those concerning fare advertising) through suits under their respective state laws. And Texas law, at least, imposes additional liability (by way of civil penalties and consumer treble-damages actions) for multiple violations. See Tex. Bus. & Com. Code Ann. §§ 17.47, 17.50 (1987 and Supp. 1991–1992). Like the plaintiff in *Young*, then, respondents were faced with a Hobson's choice: continually violate the Texas law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings and any further review.[1]

---

[1] We do not address whether the District Court should have abstained from entertaining this suit under the line of cases commencing with *Younger* v. *Harris*, 401 U. S. 37 (1971), which imposes heightened require-

The District Court, however, enjoined petitioner not only from enforcing the fare advertising sections of the guidelines, but also from "initiating any enforcement action . . . which would seek to regulate or restrict any aspect of the . . . plaintiff airlines' air fare advertising or the operations involving their rates, routes, and/or services." 712 F. Supp., at 102. In so doing, it disregarded the limits on the exercise of its injunctive power. In suits such as this one, which the plaintiff intends as a "first strike" to prevent a State from initiating a suit of its own, the prospect of state suit must be imminent, for it is the prospect of that suit which supplies the necessary irreparable injury. See *Public Serv. Comm'n of Utah* v. *Wycoff Co.,* 344 U. S. 237, 240–241 (1952). *Ex parte Young* thus speaks of enjoining state officers *"who threaten and are about to commence proceedings,"* 209 U. S., at 156 (emphasis added); see also *id.,* at 158, and we have recognized in a related context that a conjectural injury cannot warrant equitable relief, see *O'Shea, supra,* at 502. Any other rule (assuming it would meet Article III case-or-controversy requirements) would require federal courts to determine the constitutionality of state laws in hypothetical situations where it is not even clear the State itself would consider its law applicable. This problem is vividly enough illustrated by the blunderbuss injunction in the present case, which declares pre-empted "any" state suit involving "any aspect" of the airlines' rates, routes, and services. As petitioner has threatened to enforce only the obligations described in the guidelines regarding fare advertising, the

ments for an injunction to restrain an already-pending or an about-to-be-pending state criminal action, or civil action involving important state interests, see generally *Middlesex County Ethics Comm.* v. *Garden State Bar Assn.,* 457 U. S. 423, 431–432, 437 (1982); *Trainor* v. *Hernandez,* 431 U. S. 434, 440–447 (1977); *Younger, supra,* at 43–49. Petitioner has not argued for abstention, and the federal-state comity considerations underlying *Younger* are accordingly not implicated. See *Brown* v. *Hotel Employees,* 468 U. S. 491, 500, n. 9 (1984); *Ohio Bureau of Employment Services* v. *Hodory,* 431 U. S. 471, 480 (1977).

injunction must be vacated insofar as it restrains the operation of state laws with respect to other matters.

### III

We now turn to the question whether enforcement of the NAAG guidelines on fare advertising through a State's general consumer protection laws is pre-empted by the ADA. As we have often observed, "[p]re-emption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *FMC Corp.* v. *Holliday,* 498 U. S. 52, 56–57 (1990) (internal quotation marks omitted); *Shaw* v. *Delta Air Lines, Inc.,* 463 U. S. 85, 95 (1983). The question, at bottom, is one of statutory intent, and we accordingly "'begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Holliday, supra,* at 57; *Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.,* 469 U. S. 189, 194 (1985).

### A

Section 1305(a)(1) expressly pre-empts the States from "enact[ing] or enforc[ing] any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier . . . ." For purposes of the present case, the key phrase, obviously, is "relating to." The ordinary meaning of these words is a broad one—"to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with," Black's Law Dictionary 1158 (5th ed. 1979)—and the words thus express a broad pre-emptive purpose. We have repeatedly recognized that in addressing the similarly worded pre-emption provision of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U. S. C. § 1144(a), which pre-empts all state laws "insofar as they . . . relate to any employee benefit plan." We have said, for ex-

ample, that the "breadth of [that provision's] pre-emptive reach is apparent from [its] language," *Shaw, supra,* at 96; that it has a "broad scope," *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724, 739 (1985), and an "expansive sweep," *Pilot Life Ins. Co.* v. *Dedeaux,* 481 U. S. 41, 47 (1987); and that it is "broadly worded," *Ingersoll-Rand Co.* v. *McClendon,* 498 U. S. 133, 138 (1990), "deliberately expansive," *Pilot Life, supra,* at 46, and "conspicuous for its breadth," *Holliday, supra,* at 58. True to our word, we have held that a state law "relates to" an employee benefit plan, and is pre-empted by ERISA, "if it has a connection with or reference to such a plan." *Shaw, supra,* at 97. Since the relevant language of the ADA is identical, we think it appropriate to adopt the same standard here: State enforcement actions having a connection with, or reference to, airline "rates, routes, or services" are pre-empted under 49 U. S. C. App. § 1305(a)(1).

Petitioner raises a number of objections to this reading, none of which we think is well taken. First, he claims that we may not use our interpretation of identical language in ERISA as a guide, because the sweeping nature of ERISA pre-emption derives not from the "relates to" language, but from "the wide and inclusive sweep of the comprehensive ERISA scheme," which he asserts the ADA does not have. Brief for Petitioner 33–34. This argument is flatly contradicted by our ERISA cases, which clearly and unmistakably rely on express pre-emption principles and a construction of the phrase "relates to." See, *e. g., Shaw, supra,* at 96–97, and n. 16 (citing dictionary definitions); *Ingersoll-Rand, supra,* at 138–139. Petitioner also stresses that the FAA "saving" clause, which preserves "the remedies now existing at common law or by statute," 49 U. S. C. App. § 1506, is broader than its ERISA counterpart. But it is a commonplace of statutory construction that the specific governs the general, see, *e. g., Crawford Fitting Co.* v. *J. T. Gibbons, Inc.,*

482 U. S. 437, 445 (1987), a canon particularly pertinent here, where the "saving" clause is a relic of the pre-ADA/no preemption regime. A general "remedies" saving clause cannot be allowed to supersede the specific substantive pre-emption provision—unless it be thought that a State having a statute requiring "reasonable rates," and providing remedies against "unreasonable" ones, could actually set airfares. As in *International Paper Co.* v. *Ouellette*, 479 U. S. 481, 494 (1987), "we do not believe Congress intended to undermine this carefully drawn statute through a general saving clause."

Petitioner contends that § 1305(a)(1) only pre-empts the States from actually prescribing rates, routes, or services. This simply reads the words "relating to" out of the statute. Had the statute been designed to pre-empt state law in such a limited fashion, it would have forbidden the States to "*regulate* rates, routes, and services." See *Pilot Life, supra,* at 50 ("A common-sense view of the word 'regulates' would lead to the conclusion that in order to regulate [a matter], a law . . . must be specifically directed toward [it]").[2] Moreover,

---

[2] The dissent believes petitioner's position on this point to be supported by the history and structure of the ADA (sources it deems "more illuminating" than a "narrow focus" on the ADA's language, *post,* at 421), because the old regime did not pre-empt the state laws involved here and the ADA's legislative history contains no statements specifically addressed to state regulation of advertising. *Post,* at 421–426. Suffice it to say that legislative history need not confirm the details of changes in the law effected by statutory language before we will interpret that language according to its natural meaning. See, *e. g., Harrison* v. *PPG Industries, Inc.,* 446 U. S. 578, 591–592 (1980).

It also bears mention that the rejected Senate bill did contain language that would have produced precisely the result the dissent desires: "No State shall enact any law . . . *determining* routes, schedules, or rates, fares, or charges in tariffs of . . . ." S. 2493, § 423(a)(1), reprinted in S. Rep. No. 95–631, p. 39 (1978) (emphasis added). The dissent is unperturbed by the full Congress' preference for "relating to" over "determining," because the Conference Report gave "no indication that the conferees thought the House's 'relating to' language would have a broader

if the pre-emption effected by § 1305(a)(1) were such a limited one, no purpose would be served by the very next subsection, which preserves to the States certain proprietary rights over airports. 49 U. S. C. App. § 1305(b).

Next, petitioner advances the notion that only state laws specifically addressed to the airline industry are pre-empted, whereas the ADA imposes no constraints on laws of general applicability. Besides creating an utterly irrational loophole (there is little reason why state impairment of the federal scheme should be deemed acceptable so long as it is effected by the particularized application of a general statute), this notion similarly ignores the sweep of the "relating to" language. We have consistently rejected this precise argument in our ERISA cases: "[A] state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect." *Ingersoll-Rand, supra,* at 139; see *Pilot Life, supra,* at 47–48 (common-law tort and contract suits pre-empted); *Metropolitan Life,* 471 U. S., at 739 (state law requiring health insurance plans to cover certain mental health expenses pre-empted); *Alessi* v. *Raybestos-Manhattan, Inc.,* 451 U. S. 504, 525 (1981) (workers' compensation laws pre-empted).

Last, the State suggests that pre-emption is inappropriate when state and federal law are consistent. State and federal law are in fact inconsistent here—the DOT opposes the obligations contained in the guidelines, and Texas law imposes greater liability—but that is beside the point. Nothing in the language of § 1305(a)(1) suggests that its "relating

pre-emptive scope than the Senate's . . . language," *post,* at 426—which is to say because the Conference Report failed to specify the completely obvious, that "relating to" is broader than "determining." The dissent evidently believes not only that plain statutory language cannot be credited unless specifically explained in legislative history, but also that the apparent import of legislative history cannot be credited unless specifically explained in legislative history.

to" pre-emption is limited to *inconsistent* state regulation; and once again our ERISA cases have settled the matter: "'The pre-emption provision . . . displace[s] all state laws that fall within its sphere, even including state laws that are consistent with ERISA's substantive requirements.'" *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 829 (1988); *Metropolitan Life, supra,* at 739.

## B

It is hardly surprising that petitioner rests most of his case on such strained readings of § 1305(a)(1), rather than contesting whether the NAAG guidelines really "relat[e] to" fares. They quite obviously do. Taking them *seriatim:* Section 2.1, governing print advertisements of fares, requires "clear and conspicuous disclosure [defined as the lesser of one-third the size of the largest typeface in the ad or ten-point type] of restrictions such as" limited time availability, limitations on refund or exchange rights, time-of-day or day-of-week restrictions, length-of-stay requirements, advance-purchase and round-trip-purchase requirements, variations in fares from or to different airports in the same metropolitan area, limitations on breaks or changes in itinerary, limits on fare availability, and "[a]ny other material restriction on the fare." Section 2.2 imposes similar, though somewhat less onerous, restrictions on broadcast advertisements of fares; and § 2.3 requires billboard fare ads to state clearly and conspicuously "'Substantial restrictions apply'" if there are any material restrictions on the fares' availability. The guidelines further mandate that an advertised fare be available in sufficient quantities to "meet reasonably foreseeable demand" on every flight on every day in every market in which the fare is advertised; if the fare will not be available on this basis, the ad must contain a "clear and conspicuous statement of the extent of unavailability." § 2.4. Section 2.5 requires that the advertised fare include all taxes and surcharges; round-trip fares, under § 2.6, must be dis-

closed at least as prominently as the one-way fare when the fare is only available on round trips; and § 2.7 prohibits use of the words "'sale,' 'discount,' [or] 'reduced'" unless the advertised fare is available only for a limited time and is "substantially below the usual price for the same fare with the same restrictions."

One cannot avoid the conclusion that these aspects of the guidelines "relate to" airline rates. In its terms, every one of the guidelines enumerated above bears a "reference to" airfares. *Shaw,* 463 U. S., at 97. And, collectively, the guidelines establish binding requirements as to how tickets may be marketed if they are to be sold at given prices. Under Texas law, many violations of these requirements would give consumers a cause of action (for at least actual damages, see Tex. Bus. & Com. Code Ann. § 17.50 (1987 and Supp. 1991–1992)) for an airline's failure to provide a particular advertised fare—effectively creating an enforceable right to that fare when the advertisement fails to include the mandated explanations and disclaimers. This case therefore appears to us much like *Pilot Life,* in which we held that a common-law tort and contract action seeking damages for the failure of an employee benefit plan to pay benefits "relate[d] to" employee benefit plans and was pre-empted by ERISA. 481 U. S., at 43–44, 47–48.

In any event, beyond the guidelines' express reference to fares, it is clear as an economic matter that state restrictions on fare advertising have the forbidden significant effect upon fares. Advertising "serves to inform the public of the . . . prices of products and services, and thus performs an indispensable role in the allocation of resources." *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 364 (1977). Restrictions on advertising "serv[e] to increase the difficulty of discovering the lowest cost seller . . . and [reduce] the incentive to price competitively." *Id.,* at 377. Accordingly, "where consumers have the benefit of price advertising, retail prices often are dramatically lower than they would be without advertis-

ing." *Ibid.* As Judge Easterbrook succinctly put it, compelling or restricting "[p]rice advertising surely 'relates to' price." *Illinois Corporate Travel* v. *American Airlines, Inc.*, 889 F. 2d 751, 754 (CA7 1989), cert. denied, 495 U. S. 919 (1990).

Although the State insists that it is not compelling or restricting advertising, but is instead merely preventing the market distortion caused by "false" advertising, in fact the dynamics of the air transportation industry cause the guidelines to curtail the airlines' ability to communicate fares to their customers. The expenses involved in operating an airline flight are almost entirely fixed costs; they increase very little with each additional passenger. The market for these flights is divided between consumers whose volume of purchases is relatively insensitive to price (primarily business travelers) and consumers whose demand is very price sensitive indeed (primarily pleasure travelers). Accordingly, airlines try to sell as many seats per flight as possible at higher prices to the first group, and then to fill up the flight by selling seats at much lower prices to the second group (since almost all the costs are fixed, even a passenger paying far below average cost is preferable to an empty seat). In order for this marketing process to work, and for it ultimately to redound to the benefit of price-conscious travelers, the airlines must be able to place substantial restrictions on the availability of the lower priced seats (so as to sell as many seats as possible at the higher rate), and must be able to advertise the lower fares. The guidelines severely burden their ability to do both at the same time: The sections requiring "clear and conspicuous disclosure" of each restriction make it impossible to take out small or short ads, as does (to a lesser extent) the provision requiring itemization of both the one-way and round-trip fares. Since taxes and surcharges vary from State to State, the requirement that advertised fares include those charges forces the airlines to create different ads in each market. The section restricting

the use of "sale," "discount," or "reduced" effectively prevents the airlines from using those terms to call attention to the fares normally offered to price-conscious travelers. As the FTC observed, "[r]equiring too much information in advertisements can have the paradoxical effect of stifling the information that consumers receive." Letter from FTC to Christopher Ames, Deputy Attorney General of California, dated Mar. 11, 1988, App. to Brief for Respondent Airlines 23a. Further, § 2.4, by allowing fares to be advertised only if sufficient seats are available to meet demand or if the extent of unavailability is disclosed, may make it impossible to use this marketing process at all. All in all, the obligations imposed by the guidelines would have a significant impact upon the airlines' ability to market their product, and hence a significant impact upon the fares they charge.[3]

In concluding that the NAAG fare advertising guidelines are pre-empted, we do not, as Texas contends, set out on a road that leads to pre-emption of state laws against gambling and prostitution as applied to airlines. Nor need we address whether state regulation of the nonprice aspects of fare advertising (for example, state laws preventing obscene depictions) would similarly "relat[e] to" rates; the connection would obviously be far more tenuous. To adapt to this case our language in *Shaw*, "[s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner" to have pre-emptive effect. 463 U. S., at 100, n. 21. In this case, as in *Shaw*, "[t]he present litigation plainly does not present a borderline question, and we express no views about where it would be appropriate to draw the line." *Ibid.* Finally, we note that our decision does not give the airlines *carte blanche* to lie to and deceive consumers; the

---

[3] The dissent disagrees with this—not, as it turns out, because it disputes our description of the pricing process in the airline industry, but because it does not think that the guidelines would have a "significant" effect on rates. *Post*, at 427. That conclusion is unexplained, and seems to us inexplicable.

DOT retains the power to prohibit advertisements which in its opinion do not further competitive pricing, see 49 U. S. C. App. § 1381.

*     *     *

We hold that the fare advertising provisions of the NAAG guidelines are pre-empted by the ADA, and affirm the judgment of the Court of Appeals insofar as it awarded injunctive and declaratory relief with respect to those provisions. Insofar as that judgment awarded injunctive relief directed at other matters, it is reversed and the injunction vacated.

*It is so ordered.*

JUSTICE SOUTER took no part in the consideration or decision of this case.

## APPENDIX TO OPINION OF THE COURT

National Association of Attorneys General
Task Force on the Air Travel Industry
Revised Guidelines

## INTRODUCTION

In June, 1987, the National Association of Attorneys General ("NAAG") directed the appointment of a Task Force of states to study the advertising and marketing practices of the airline industry in the United States. In addition to the study, the Task Force was directed to determine the nature and extent of existing unfair and deceptive airline advertising practices and to report a recommended course of action to NAAG at its meeting in December 1987.

The Task Force Report and Recommendations were adopted by NAAG at its winter meeting on December 12, 1987, with a continuing direction to the Task Force (1) to receive and examine any comments from industry, consumer groups, federal agencies, and other interested parties; (2) to evaluate these comments; and (3) to report to NAAG at its

Spring 1988 meeting on the advisability of any modifications of the Guidelines.

The Task Force received written comments from the Air Transport Association, the American Association of Advertising Agencies, American Airlines, the Association of National Advertisers, the Council of Better Business Bureaus, the Federal Trade Commission, the National Association of Broadcasters, Southwest Airlines, United Airlines, USAir, and the U. S. Department of Transportation. Assistant attorneys general of the Task Force states evaluated these comments, and reported their recommendations to NAAG.

On March 15, 1988, NAAG adopted the recommended changes to the frequent flyer Guidelines and directed that the comments to both the fare advertising and frequent flyer Guidelines be changed to respond to valid concerns raised by those filing comments. The Guidelines and comments herein reflect the changes directed by NAAG.

NAAG also directed the chair of NAAG's Consumer Protection Committee to appoint four attorneys general to serve on a continuing task force to evaluate the effectiveness of the Guidelines and to continue discussions with members of the industry and other interested parties. These attorneys general are: John Van de Kamp (California), Neil F. Hartigan (Illinois), Jim Mattox (Texas), and Kenneth O. Eikenberry (Washington).

It is important to note that these Guidelines do not create any new laws or regulations regarding the advertising practices or other business practices of the airline industry. They merely explain in detail how existing state laws apply to air fare advertising and frequent flyer programs. Each Guideline is followed by a comment which summarizes:

- NAAG's intent with respect to that Guideline.
- Any relevant comments received by the Task Force.
- Any significant changes that were made to the Guidelines.

## Section 1—Definitions

1.0 Advertisement means any oral, written, graphic or pictorial statement made in the course of solicitation of business. Advertisement includes, without limitation, any statement or representation made in a newspaper, magazine or other public publication, or contained in any notice, sign, billboard, poster, display, circular, pamphlet, or letter (collectively called "print advertisements"), or on radio or television ("broadcast commercials").

*Comment: This definition encompasses those materials and media covered by most states' false advertising statutes. "Print advertisements" and "broadcast commercial" are separated into different categories because they are afforded slightly different treatment under these Guidelines. This represents a change from an earlier draft of the Guidelines and is an attempt to address some of the airlines' concerns regarding the difficulties of lengthy disclosures in broadcast commercials.*

1.1 Award means any coupon, certificate, voucher, benefit or tangible thing which is promised, given, sold or otherwise transferred by an airline or program partner to a program member in exchange for mileage, credits, bonuses, segments or other units of value credited to a consumer as an incentive to fly on any airline or to do business with any program partner.

*Comment: This definition, as well as definitions 1.2, 1.3, 1.4, 1.6, 1.9, and 1.10, is self-explanatory.*

1.2 Award level means a specified amount of mileage or number of credits, bonuses, segments or other units which a program member must accumulate in order to receive an award.

1.3 Blackout date means any date on which travel or use of other program benefits is not permitted for program members seeking to redeem their award levels. This is a form of capacity control.

1.4 Capacity control means the practice by which an airline or program partner restricts or otherwise limits the opportunity of program members to redeem their award levels for travel or other benefits offered in the program.

1.5 Clear and conspicuous means that the statement, representation or term ("statement") being disclosed is of such size, color contrast, and audibility and is so presented as to be readily noticed and understood by the person to whom it is being disclosed. All language and terms should be used in accordance with their common or ordinary usage and meaning. For example, "companion" should be used only when it means any companion (*i. e.*, any person traveling with the program member), not solely family members. Without limiting the requirements of the preceding sentences:

(a) A statement in a print advertisement is considered clear and conspicuous if a type size is used which is at least one-third the size of the largest type size used in the advertising. However, it need not be larger than:

- 10-point type in advertisements that are 200 square inches or smaller, and
- 12-point type in advertisements that are larger than 200 square inches.

If the statement is in the body copy of the advertisement, it may be in the same size type as the largest type used in the body copy, and does not have to meet these type-size requirements.

(b) A statement in a broadcast commercial is considered clear and conspicuous if it is made orally and is as clear and understandable in pace and volume as the fare information.

(c) A statement on any billboard is considered clear and conspicuous if a type is used which is at least one-third the size of the largest one size used on the billboard.

(d) A statement required by Section 3, relating to frequent flyer programs, is considered clear and conspicuous if it is prominently located directly adjacent to the materials to which it applies. Type size should be no smaller than the most commonly-used print size in the document, but in no event smaller than 10-point type. Any reservation of any right to make future changes in the program or award levels should be located prominently at the beginning of printed materials.

*Comment: One of the most deceptive aspects of current air fare advertisements is the completely inadequate manner in which those advertisements disclose the restrictions and limitations which apply to the advertised fares. The restrictions disclosed in print advertisements are rarely located near the fare advertised and often appear only in extremely small type at the bottom of the advertisement. In broadcast commercials, such disclosures are generally absent from radio advertisements, and if included at all in television commercials appear as written disclosures flashed on the screen much too quickly for the average person to read. On billboards any mention of restrictions on advertised fares is unusual.*

*Given this background, NAAG believes that it is necessary to define clearly for the airlines what constitutes clear and adequate disclosure in all advertising media. The type-size minima for print advertisements are aimed at making the disclosures both easy to read and noticeable. Consequently, a slightly larger size print is suggested in larger size advertisements. These type-size minima are not absolute. That is, print disclosures do not in every instance have to be in at least 10-point type, as long as they are clear and conspicuous regardless of the size of the type. The type size suggestions are merely examples of advertising practices which give an airline a reasonable expectation that it will not be sued if it follows the Guidelines. In the*

*Task Force's meetings with the airlines last summer, one common note expressed was that the airlines could abide by disclosure guidelines, as long as they were clear and enforced uniformly. If an airline does not choose this safe harbor and instead ventures into untested waters, it may run aground and it may not. But it is free to do so.*

*The comments to this Guideline were critical largely because NAAG singled out airline advertisements for this treatment. However, on the whole, the airlines indicated they could meet the type size standard relatively easily in print advertisements.*

*NAAG elected to encourage oral disclosures in broadcast media, because written disclosures are difficult if not impossible to read and because many people listen to, rather than watch television commercials. We continue to believe that oral disclosure is the best method of conveying information in a television commercial. However, the converse of this Guideline is not true—a disclosure in a television commercial is not necessarily deceptive if it is instead made in a video super or crawl, as long as it is still clear and conspicuous.*

*For safety reasons, very large type is provided for billboards.*

1.6 Frequent flyer program means any program offered by an airline or program partner in which awards are offered to program members.

1.7 Limited-time availability means that the fare is only available for a specific period of time or that the fare is not available during certain blackout periods.

*Comment: This definition applies to air fares that are only available certain times of the year (e. g., available December 15 through April 15), are not available at certain times at all (not available December 23 through January 5), or are only available until a date certain (available only until January 15). It does not apply to fares that are un-*

*available only on certain days of the week or times of the day.*

1.8 Material restriction means a restriction, limitation, or other requirement which affects the use or refundability of a ticket, and which is not generally applicable to all classes of fares or tickets (such as standard conditions of carriage).

*Comment: Due to the numerous standard conditions applicable to most airline tickets, NAAG has confined the definition of "material restrictions" to those restrictions and limitations that are specific and unique to certain fare categories (i. e., those that are different from the restrictions and limitations that apply to a standard coach ticket).*

1.9 Program member means any consumer who has applied and been accepted for membership in an airline's frequent flyer program, regardless of whether he or she has accrued mileage, credits, bonuses, segments or other units of value on an airline or with any program partner.

1.10 Program partner means any business entity which provides awards as part of an airline's frequent flyer program.

1.11 Vested member means a member of a frequent flyer program who is enrolled in an existing program and has provided consideration to the airline or its partners, and who has not received adequate notice of program changes such as set forth in Sections 3.2 and 3.9. For example, consideration includes purchasing tickets on an airline, renting a car or using a specific credit card.

*Comment: This definition separates out those consumers who joined a frequent flyer program without receiving adequate notice of how that program could change prospectively. The Guidelines afford some special protections to vested members and vested miles. There is sound reason for this.*

*After reviewing the travel reward promotional materials for most of the major airlines, NAAG concluded that currently vested members have not received adequate disclo-*

sure of the potential for significant increases in award levels or imposition of other restrictions which may result in the airlines' unilateral devaluation of awards. Therefore, the Guidelines treat vested members and the miles which members accrued before receiving adequate notice of prospective changes differently.

1.12 Vested mile means program mileage (or other credits) accumulated by a vested member before that person receives adequate notice of program changes, as set forth in Sections 3.2 and 3.9.

Comment: This definition identifies any mileage or credit accrued by a vested member before he or she received adequate notice regarding the possibility of future detrimental changes in the program. See the comments to the definition of vested member.

### Section 2—Fare Advertisements

2.0 General guideline

Any advertisement which provides air fares or other price information must be in plain language, clear and conspicuous, and non-deceptive. Deception may result not only from a direct statement in the advertisement and from reasonable inferences therefrom, but also omitting or obscuring a material restriction.

Comment: This Guideline and the following Guidelines restate individual states' false advertising and deceptive practices statutes as they apply to air fare and price advertising.

2.1 Disclosure in print advertisements

Print advertisements for fares must make clear and conspicuous disclosure of restrictions such as:

- Limited-time availability.
- Limitations on right to refund or exchange of ticket.
- Time of day or day of week restrictions.
- Length of stay requirements.

- Advance purchase requirements.
- Round trip purchase requirements.
- Variations in fares to or from two or more airports serving the same metropolitan area.
- Limitations on, or extra charges for, breaks or changes in itinerary, such as failure to travel on every leg as scheduled.
- The statement, if any, required by Guideline 2.4.
- Any other material restriction on the fare.

This Guideline would be met by disclosing material restrictions either:

- in the body copy of the advertisement,
- adjacent to the fare price, or
- in a box with a heading such as "Restrictions."

Examples (in 10-point type) of disclosures of material restrictions if they apply to fares being advertised are:

In the body copy:
RESTRICTIONS. "Weekend traveler" fares are generally available all day Saturday and Sunday until 6 p.m. However, these fares are not available on some flights on some days.

In the box:

---

Restrictions

These restrictions apply to one or more of these fares:
- 30 day advance purchases required
- Not available November 20–December 1
- New York fares only to Newark Airport

---

or

---

Restrictions. Advertised fares are only available Tuesday, Wednesday, and Thursday afternoons. Three-day advance purchases required. 50% cancellation penalty applies.

---

*Comment: The advantage to consumers of print advertisements over television or radio advertisements is that they give consumers something tangible to use as a reference when shopping for low cost air fares. Because consumers can take their time and carefully read a print advertisement it is especially important that this type of advertisement contain the most accurate and complete information possible regarding any advertised air fares. The restrictions singled out by NAAG in this Guideline for disclosure are those NAAG believes are the most significant to a consumer contemplating purchasing a ticket. An advertisement that complies with this Guideline will give a consumer three crucial pieces of information:*

*1. Eligibility—consumers will know if they are eligible for the fare (i. e., can a consumer meet advance purchase requirements or other restrictions affecting time or date of travel?);*

*2. Availability—consumers can accurately gauge the likelihood that they will be able to obtain a ticket at the advertised price; and*

*3. Risk—consumers will know the risks associated with purchasing a ticket at the advertised price (i. e., is the ticket non-refundable or do other penalties apply upon cancellation or changes in itinerary?).*

*This particular Guideline received a great deal of negative comment because the airlines and government agencies misunderstood it to mean that it required full disclosure of all of the restrictions that apply to each specific flight. This is not correct. The Guideline only requires that if any of the restrictions listed in the Guideline apply to any of the air fares advertised then the advertisement must disclose the existence of that restriction and the fact that the restriction applies to one or more of the air fares advertised. To clear up this misunderstanding, NAAG included specific examples of the disclosures required by the revised Guidelines. There was also some misunderstanding that disclosure in*

*a box was required. As the Guideline states, this is just one option.*

*The comments made to the December Guidelines evidenced another misconception about the wording of the disclosures on fare restrictions. This Guideline provides suggested wording, again to assist the airlines in determining how to meet the disclosures, but the language is by no means sacrosanct. The best creative minds in the advertising business are available to the airlines through their advertising agencies. The airlines are free to avail themselves of these talents, who are certainly adept at phrasing a message the advertiser wants to get across to the consumer. The essence of the Guidelines is that consumers must be advised of the limits which the airlines has [sic] chosen to impose on consumers' ability to buy tickets at the advertised price.*

## 2.2 Disclosure in broadcast commercials

Broadcast commercials for fares must make clear and conspicuous disclosure of:

- Limited-time availability.
- Limitations on right to refund or exchange of ticket.
- The statement, if any, required by Guideline 2.4.

In addition, if the following seven disclosures are not made in a clear and conspicuous manner in the commercial, any that are applicable must be disclosed orally to the passenger before reservations are actually made:

- Time of day or day of week restrictions.
- Length of stay requirements.
- Advance purchase requirements.
- Round trip purchase requirements.
- Variations in fares to or from two or more airports serving the same metropolitan area.
- Limitations on, or extra charges for, breaks or changes in itinerary, such as failure to travel on every leg as scheduled.

• Any other material restriction in the fare.

As to these seven types of disclosure, the airline may include any or all in the commercial or may choose to defer disclosure until the time reservations are actually made.

If any of these seven disclosures applies to the fare advertised and the airline chooses to defer disclosure until the time the reservations are actually made, the commercial must give clear and conspicuous disclosure that "Other substantial restrictions apply," or similar language. The statement "Restrictions apply" is not sufficient.

*Comment: In an earlier draft, the Guidelines required that radio and television advertisements include all the same disclosures required in print advertisements. The airline industry unanimously responded that such detailed disclosures would be impossible to include in the 15 and 30 second advertising spots generally purchased for radio and television ads, and argued that, even if time allowed this much oral disclosure, the resulting commercial would provide too much information for a consumer to absorb usefully. They concluded that such a requirement would eliminate airline price advertising on television and radio.*

*The provision of fare information, without stating the most significant restrictions that apply to the fare advertised, is deceptive and ultimately harmful to consumers and the airline industry alike.*

*The Guideline as revised provides a compromise. It suggests disclosure of the three most serious restrictions that can apply to an airline ticket—limited time availability, nonrefundability or exchangeability and limitations on fare availability. Disclosure of all of these restrictions can be accomplished by something as simple as the following statement: "Tickets are nonrefundable, are not available on all flights, and must be purchased by December 15. Other significant restrictions apply." These 20 words can easily be read in a 30 second commercial. In addition, some or all of this information may be clearly and conspicuously*

*disclosed in a video super or crawl in television commercials. Of course, this option is not available for radio commercials. However, commenting airlines confirmed that the typical radio spot is 60 seconds, making the concern about time less crucial.*

*Airlines then have the option of disclosing any additional material restrictions in the advertisement itself or deferring such disclosure until a consumer makes a reservation. Of course, if an airline does not choose to restrict its fare severely, fewer words (and thus, less air time) is needed.*

*This compromise position also recognizes that print advertising lends itself more readily to detailed information in a form which the consumer can retain and refer to at his own pace. For this reason, NAAG has chosen to require less disclosure in broadcast, allowing print to be the medium for full disclosure.*

## 2.3 Disclosure on billboards

Any billboard which provides air fare or other price information on a fare to which any material restrictions apply must have clear and conspicuous language such as "Substantial restrictions apply." The statement "Restrictions apply" is not sufficient.

*Comment: For safety reasons, NAAG concluded that lengthy written disclosures on billboards are inappropriate and potentially hazardous to drivers. We disagree with the DOT that this special treatment of price advertising on billboards will result in a proliferation of billboards on our nation's highways.*

## 2.4 Fare availability

Any advertised fare must be available in sufficient quantity so as to meet reasonably foreseeable demand on every flight each day for the market in which the advertisement appears, beginning on the day on which the advertisement

appears and continuing for at least three days after the advertisement terminates.

However, if the advertised fare is not thus available, the advertisement must contain a clear and conspicuous statement to the extent of unavailability of the advertised fare.

Statements such as "Seats limited" and "Restrictions apply" do not meet this Guideline. These examples do meet this Guideline:

- This fare may not be available when you call.
- This fare is not available on all flights.
- This fare is only available on some Saturday and Sunday flights.

*Comment: This Guideline elicited the greatest amount of negative comments from the airline industry, the ATA, FTC and the DOT. They argue that this Guideline is impossible to implement because, due to the complexity of airline pricing systems, the number of seats available at a particular low fare on a particular flight is not a fixed number. It is continuously modified up to the point of departure. They suggest that it is acceptable for the airlines to communicate a general invitation to the public to buy low fare seats, but then reduce the number of seats available to zero or close to zero for the most popular flights, because the possibility that a consumer can purchase a seat at the advertised price exists at the time the advertisement is placed.*

*The complexity of the airlines' system cannot justify the unfairness of such an approach. No other retailer would be allowed to justify a failure to stock an advertised item on the grounds that, at the last minute the retailer decided it was less costly not to stock the item it had just advertised. The availability of an item advertised, at the price advertised, goes to the very heart of truthful advertising. If an airline advertises an air fare that is not available on each and every flight to the destination advertised, and this fact*

*is not disclosed, then the advertisement is deceptive on its face.*

*While NAAG appreciates the difficulty of disclosing the specific number of seats available on each flight advertised, a disclosure that "This fare is not available on all flights" or "This fare may not be available when you call" is not particularly onerous. Absent such disclosure, airlines, as all other retailers, should be required to have sufficient stock available to meet reasonable demand for any fare advertised.*

2.5 Surcharges

Any fuel, tax, or other surcharge to a fare must be included in the total advertised price of the fare.

*Comment: Recently, several airlines considered the possibility of passing along an increase in the cost of fuel to consumers by imposing a "fuel surcharge" rather than simply raising air fares to reflect their increased costs. The air fare advertised was to remain the same, but a footnote would be added to the advertisement in the "mice type" disclosing that, for instance, a $16 fuel surcharge would be tacked on to the advertised fare. The potential for abuse, if this type of price advertising is permitted, is obvious. It would only be a matter of time before $19 air fares from New York to California could be advertised with $300 meal, fuel, labor, and baggage surcharges added in a footnote. The total advertised price of the fare must include all such charges in order to avoid these potential abuses. However, this Guideline should not be construed to require an airline to do the impossible. We do not believe that such minimal tour-related charges fall within the meaning of "fare" and therefore do not believe that unknown charges must be disclosed as a surcharge (if the amounts are not in fact known). This of course does not mean that charges which are known—either as an exact amount or as a percentage—do not have to be disclosed in advertisements.*

## 2.6 Round trip fare advertising

If an airline elects to advertise the one-way portion of a fare that is only available as a round-trip purchase, this restriction, together with the full round-trip fare, must be advertised in a clear and conspicuous manner, at least as prominently as the one-way fare.

*Comment: Airlines routinely advertise one-half of the price (i. e., the alleged "one-way" price) for tickets that are only available if a consumer makes a round-trip purchase. Under this Guideline, if an airline elects to continue this advertising practice, it must also disclose that the fare is only available if a consumer purchases a round trip ticket and the actual price of the full round trip ticket. The disclosure must be made in a type size and location as prominent as the fare advertised.*

*The airlines have, for the most part, stated a willingness to advertise the full round trip air fare if all of the airlines do the same. This Guideline is intended to encourage all airlines to adopt this practice.*

## 2.7 Deceptive use of "sale," "discount," "reduced," or similar terms

A fare may be advertised by use of the words "sale," "discount," "reduced," or other such words that suggest that the fare advertised is a temporarily reduced fare and is not a regularly-available fare only if that fare is:

- available only for a specified, limited period of time, and
- substantially below the usual price for the same fare with the same restrictions.

*Comment: The majority of airline tickets sold each year sell at prices significantly lower than the full "Y" or standard regular coach fare. These lower fares are offered year round and airlines in theory allocate a certain amount of seats to each fare "bucket." As a result, the regular coach*

*fare has ceased to have any meaning as a starting point for determining whether or not a ticket is being offered for a "sale" price as consumers have come to understand that term.*

*In this Guideline NAAG has attempted to prevent consumer confusion by limiting the use of such words as "sale," "discount," or "reduced," to describe only those fares that represent a true savings over regularly available air fares— those that are available only for short periods of time and are substantially below any regularly offered fare for a ticket carrying identical restrictions.*

## Section 3—Frequent Flyer Programs
### *General Comments to Section 3*

*Frequent flyer programs have been widely acknowledged as the most successful marketing programs in airline industry history. The bargain struck between customers and the airlines has proven to be very costly to many of the airlines. Customers who have accrued the necessary mileage are expecting to collect the awards which led them to join and fly in the programs in the first place. Some airlines are now disturbed by the cost of keeping their side of the bargain and the real possibility that they may lose revenue because passengers flying on frequent flyer awards may begin displacing paying customers. The solution contemplated by some carriers has been to raise award thresholds and implement restrictions to decrease the cost to them of the award program. The effect of these actual and/or potential changes is to significantly devalue vested members' accrued mileage or other credits in the program. Although various frequent flyer program awards materials have contained some obscure mention of the possibility of future program changes, these disclosures have been wholly inadequate to inform program members of the potentially major negative changes which are contemplated by many airlines.*

*These Guidelines cover frequent flyer programs including any partner airlines or other providers of goods or services such as rental cars and hotel rooms. They are intended to protect those consumers who have participated in these programs in good faith, without adequate notice that the programs could change, and to advise the airlines of how they can reserve this right in the future by adequately providing this information to all members in a nondeceptive manner consistent with state law.*

3.0 Capacity controls

1. If an airline or its program partners employ capacity controls, the airline must clearly and conspicuously disclose in its frequent flyer program solicitations, newsletters, rules and other bulletins the specific techniques used by the airline or program partner to control capacity in any solicitation which states a specific award. This includes blackout dates, limits on percentage of seats (for example, "the number of seats on any flight allocated to award recipients is limited"), maximum number of seats or rooms allocated or any other mechanism whereby the airline or program partner limits the opportunities of program members redeeming frequent flyer award levels. To meet this Guideline, all blackout dates must be specifically disclosed.

2. As to awards for vested miles, the airline or program partner must provide the award to the vested member without capacity controls or provide the award with capacity controls within a reasonable period of time. A reasonable period would be within 15 days before or after the date originally requested. If all seats within this 31-day period were sold at the time the vested member requested a reservation, so that the member could not be accommodated without displacing a passenger to whom a seat has been sold, then a reasonable period would be the period to the first available date on which every seat was not sold to the re-

quested destination at the time the program member requests a reservation.

*Comment: All of the airlines that met with the Task Force stated that they intended to retain the right to impose capacity controls, in the future, to limit the number of seats available to consumers purchasing tickets with frequent flyer award certificates. The imposition of capacity controls, including blackout dates, has the potential for unreasonably restricting the supply of seats or other benefits in such a way as to significantly devalue the awards due vested program members. NAAG found that this potential limitation has not been adequately disclosed to program members in the frequent flyer promotional materials we reviewed. This Guideline puts the airlines on notice as to what information they should provide to consumers if they want to impose capacity controls on the use of frequent flyer awards at some future date.*

*In earlier drafts of the Guidelines the Task Force took the position that capacity controls could not be applied to awards based on any mileage or credits accrued by vested members before they received adequate notice that capacity controls could be imposed. However, as a compromise, and to permit the airlines reasonable flexibility around holiday or other peak travel times, the revised Guideline provides for a reasonable time to accommodate passengers with award tickets: a 31-day "time window"—15 days before and 15 days after the date requested for ticketing. This "time window" allows the airlines to allocate capacity to meet demand over a reasonable, yet defined period of time. In the event all flights to a certain destination are sold out during the entire 31-day time window, ticketing on the next available seat would be reasonable. This approach has the additional benefit of being simple and straightforward to implement with less possibility of customer confusion and frustration.*

## 3.1 Program changes affecting vested members

1. Any airline or program partner that has not reserved the right to make future changes in the manner required by Sections 3.2 and 3.9 of these Guidelines and that changes any aspect of its program (for example, imposition of capacity controls, increases in award levels, or any other mechanism whereby a vested member's ability to redeem any award will be adversely affected) must protect vested program members. Examples which meet this Guideline are:

(a) All vested members may not be adversely affected by that change for a reasonable period. A reasonable period would be one year following mailing of notice of that change.

(b) The airline or program partner may allow vested members to lock in any award level which is in effect immediately preceding any change in the program. That award level would be guaranteed for a period of one year after mailing notice of any increase in award levels. A vested member would also be permitted to change his or her selection to lock in a different award in existence at any time prior to an increase in award levels.

(c) The airline or program partner may credit vested program members with miles or other units sufficient to assume that, at the time of any change in the program, the member will be able to claim the same awards he or she could have claimed under the old program.

*Comment: This Guideline institutes corrective measures to protect vested members and the mileage they accrued before receiving adequate notice that a program could change to their detriment at some point in the future. The Guideline sets forth three acceptable alternative approaches to allow airlines to change existing programs without unreasonably altering the rights and expectations of vested mem-*

*bers. For example, an airline may wish to create a new program with higher award levels for persons who join in the future. Guideline 3.1.1(a) grandfathers in vested members for a one-year period after notice. Guideline 3.1.1(b) grandfathers only a specified locked-in award for a one-year period after the effective date of the change and thereby gives the member an additional year to accrue mileage or units toward a specific award. Guideline 3.1.1(c) allows the program to avoid the administrative problems of distinguishing between old and new members and old and new award levels by equitably adjusting the award levels of the vested members.*

*These examples are not the only ways in which airlines can reasonably protect vested members when changing existing programs. They are intended to delineate minimum acceptable standards.*

## 3.2 Notice of Changes

1. Adequate notice of changes in current frequent flyer program award levels must be provided to vested program members by the airline or program partner to allow a reasonable time for the vested member to obtain and use an award. For example, a notice no less than one year prior to the effective date of such change would be reasonable. Reduction in award levels would not require such notice.

2. Any airline which has a policy of deleting program members from its mailing list for notices and statements must clearly and conspicuously disclose that policy in plain language in its rules and regulations.

3. To reserve the right to make future changes in the award levels and program conditions or restrictions in a manner providing reasonable notice consistent with state law, which notice is less than the notice set forth in Guideline 3.2.1, an airline must first clearly and conspicuously disclose that reservation and the nature of such future changes, in plain language. This disclosure should include examples

which make clear the outer limits within which program awards may be changed. For example, the following is not adequate disclosure:

"Program rules, regulations and mileage levels are subject to change without notice."

This example is adequate disclosure:

"(Airline) reserves the right to terminate the program with six months notice. This means that regardless of the amount you participate in this program, your right to accumulate mileage and claim awards can be terminated six months after we give you notice."

Or:

"(Airline) reserves the right to change the program rules, regulations, and mileage level. This means that (Airline) may raise mileage levels, add an unlimited number of blackout days, or limit the number of seats available to any or all destinations with notice. Program members may not be able to use awards to certain destinations, or may not be able to obtain certain types of awards such as cruises."

Or, if the airline so intends, the disclosure might also say:

"In any case, (Airline) will make award travel available within ___ days of a program member's requested date, except for blackout dates listed here."

The airline's right to make future changes, in a manner other than that provided in Guideline 3.1, shall apply only to mileage accrued after members receive the notice required by this Guideline.

*Comment: In the past, airlines have attempted to reserve the right to make radical future changes in their programs by using such vague and uncertain blanket language as "Subject to additions, deletions, or revisions at any time." The consumer outrage that ensued when several of the*

*major airlines attempted unilaterally to change their programs in the winter of 1986–87 makes it clear that consumers were not adequately told, when they joined and participated in frequent flyer programs, that they were taking a gamble that the award they were striving for would still be available, at the mileage level originally advertised by the time they accrued the necessary miles. To avoid a recurrence of this same problem in the future, this Guideline provides that the potential for such extensive program changes must be clearly and conspicuously disclosed to the public by specific example. It also puts the airlines on notice that (1) their previous attempts to disclose this critical information have been inadequate, (2) if they intend to reserve the right to make such changes in the future, they must give members new and different notice, and (3) as to vested members, airlines cannot implement any adverse changes until one year after notice is given. One year is deemed reasonable because many consumers can only travel during particular periods of the year due to work or family constraints, and therefore notice of less than a year may impact unduly harshly on a particular class of program members.*

*If an airline wants to reserve the rights to change the terms of its program without giving its members one year's notice (1) it can do so only after clear and adequate notice has been given to the program members and (2) this reduced standard can apply only to mileage accrued after clear and adequate notice has been given.*

*NAAG discovered that many airlines delete program members from their mailing lists if they are determined to be "inactive." Inactive is defined differently by each airline, but generally includes some formula requiring active participation in the program within a six to ten month period prior to any given mailing. Because crucial information regarding changes is included in program mailings, the Guidelines require that any airline with a policy of deleting*

*program members from its mailing list clearly and conspicuously disclose that policy in the rules and regulations distributed to all program members when they join.*

### 3.3 Fare or passenger class limitations

Any limitation upon the type or class of fare with which an upgrade certificate, discount flight coupon, or free companion coupon may be used must be clearly and conspicuously disclosed before the program member claims the award. Disclosure of the fare by airline terminology (for example, "Y Class") is not deemed sufficient.

*Comment: Many airlines are encouraging consumers to use their accrued mileage or credits to obtain upgrade certificates or free campaign coupons, rather than free tickets because this is more cost effective for the airlines. Many of these coupons and certificates can be used only in conjunction with a regular coach fare ticket. Because of the high cost of a full coach ticket (often disclosed only as "Y Class") many of these coupons and certificates represent no real savings and therefore are useless to consumers. This Guideline requires that any such restriction be clearly disclosed to consumers before the award is claimed.*

### 3.4 Certificates issued for vested miles

Certificates, coupons, vouchers, or tickets issued by an airline for awards redeemed for vested miles must be valid for a reasonable period of time. One year is deemed to be reasonable. Any restrictions on use, redeposit, extension, or re-issuance of certificates must be clearly and conspicuously disclosed on the certificate and in any rules, regulations, newsletter or other program materials.

*Comment: Again, because many consumers may only travel during certain periods of the year, fairness requires that awards be valid for at least a full twelve month cycle.*

### 3.5 Fees

Any airline which charges a fee for enrollment in its frequent flyer program must fully disclose at airline ticket counters and in all advertisements, solicitations or other materials distributed to prospective members prior to enrollment all terms and conditions of the frequent flyer program. Such disclosure must be made prior to accepting payment for enrollment in the airline's program.

*Comment: Some airlines have required that consumers fill out a membership application and pay a membership fee before obtaining a copy of the program rules and regulations. Because of the serious restrictions that can apply to a travel reward program, it is essential that all consumers have an opportunity to review all of the program rules and regulations before paying an enrollment fee.*

### 3.6 Redemption time

All airlines must disclose clearly and conspicuously the actual time necessary for processing award redemption requests where such requests are not normally processed promptly. An example of prompt processing would be within 14 days of processing the request. An example of a disclosure would be "processing of awards may take up to 30 days."

*Comment: The airlines indicated that full disclosure of redemption time will not be a problem.*

### 3.7 Termination of program affecting vested members

In the event a frequent flyer program is terminated, adequate notice of termination must be sent to all vested members so that vested members have a reasonable time to obtain awards and use them. Adequate notice would be notice at least one year prior to the termination of the program. Award levels in existence prior to such notice should remain in effect for one year. Program members should then have one year to use certificates, coupons, vouchers or tickets.

Any applicable capacity controls should be modified as necessary to meet the demand for all award benefits due program members.

*Comment: The airlines uniformly take the position that because participation in travel reward programs is "free," an airline should be able to terminate a travel reward program at any time without notice. NAAG strenuously disagrees. Consumers pay significant consideration for the airlines' promise to award them "free tickets" and other awards. Program members fly on a particular airline to accrue mileage in a travel reward program often foregoing a more convenient departure time, a more direct flight, and even a less expensive ticket. Those consumers who kept their part of the bargain have a right to expect the airlines to keep theirs, regardless of the cost. This Guideline affords consumers reasonable protection against unilateral changes. It gives consumers one year to accrue the mileage to reach a desired award level and one year to use the award.*

*This Guideline is intended to apply to programs that are terminated due to mergers or for any other reason. It would be unconscionable to permit airlines, which have reaped the rewards of these travel incentive programs, to walk away from their obligations to consumers under any circumstances.*

## 3.8 Restrictions

All material restrictions on frequent flyer programs must be clearly and conspicuously disclosed to current program members and to prospective members at the time of enrollment.

*Comment: This Guideline is intended as a corrective measure. Any airline that has not clearly and conspicuously disclosed material program restrictions to vested members should do so now. New members are entitled to full disclosure at the time of enrollment.*

## 3.9 Method of disclosure

Disclosures referred to in these Guidelines should be made in frequent flyer program solicitations, newsletters, rules, and other bulletins in a clear and conspicuous manner so as to assure that all program members receive adequate notice. As used in these Guidelines, disclosure also refers to information on program partners.

*Comment: The brochures containing the rules and regulations for airlines' frequent flyer programs have been as long as 52 pages. Extremely important restrictions are often buried under inappropriate topic headings or hidden on the back of the last inside pages of the brochure. This Guideline requires that restrictions be disclosed in reasonable print size in a location that will be most helpful and informative to consumers.*

*Any reservation of the right to make future changes in a program is so significant to consumers that it should be disclosed prominently to insure that the maximum number of people see and read this restriction. The Guideline permits the airlines flexibility to determine when and how often a disclosure must be made so long as the airline discloses the information in a manner which gives meaningful notice to all affected members.*

*One airline complained that Guideline 3.9 is unreasonable because it proposes that all the restrictions be disclosed at the beginning of the program brochure. In fact, the only disclosure the Guidelines suggested listing at the beginning of a brochure is the reservation of the right to change the program prospectively. The significance of such a restriction—that the terms and conditions of the program can change at any moment—is so critical that potential members should be made aware of it immediately. All other disclosures can be made in the text of the brochure.*

## Section 4—Compensation for Voluntary Denied Boarding

### 4.0 Disclosure of policies

If an airline chooses to offer ticketed passengers incentives to surrender their tickets on overbooked flights, the airline must clearly and conspicuously disclose all terms and conditions of the proposal—including any restrictions on offers of future air travel—to the person to whom the offer is made, and in the same manner in which the offer is made, before the person accepts the offer.

*Comment: Federal regulations offer specific protections and certain rights to individuals who are involuntarily bumped from a flight. Airlines, however, are free to offer whatever compensation they want to people who voluntarily give up their seat on an airplane because of overbooking. For economic reasons, airlines prefer to offer vouchers good for free tickets on future flights, instead of cash compensation to these passengers.*

*While these vouchers may seem very attractive to a consumer who has the flexibility to wait for a later flight, many carry serious restrictions on their use or are subject to lengthy black out periods when they cannot be used.*

*This Guideline requires that airlines fully disclose any and all restrictions on offers for future air travel, before a consumer agrees to give up his or her seat. It does not, as several airlines and government agencies argued in their responsive comments, set any standards for the type of compensation that airlines must offer to these passengers.*

## CONCLUSION

Consumer dissatisfaction with the airline industry has reached crisis proportions. Federal agencies have focused their attention on airline scheduling problems, on-time performance, safety, and other related issues, but have not addressed airline advertising and frequent flyer programs. Un-

checked, the airlines have engaged in practices in these areas that are unfair and deceptive under state law. The individual states through NAAG can play an important role in eliminating such practices through these Guidelines.

JUSTICE STEVENS, with whom THE CHIEF JUSTICE and JUSTICE BLACKMUN join, dissenting.

In cases construing the "virtually unique pre-emption provision" in the Employee Retirement Income Security Act of 1974 (ERISA), see *Franchise Tax Bd. of Cal.* v. *Construction Laborers Vacation Trust for Southern Cal.*, 463 U. S. 1, 24, n. 26 (1983), we have given the words "relate to" a broad reading. The construction of that unique provision was supported by a consideration of the relationship between different subsections of ERISA that have no parallel in other federal statutes, see *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 98 (1983), and by the legislative history of the provision, *id.,* at 98–99. Today we construe a pre-emption provision in the Airline Deregulation Act of 1978 (ADA), 49 U. S. C. App. § 1301 *et seq.*, a statute containing similar, but by no means identical, language. Instead of carefully examining the language, structure, and history of the ADA, the Court decides that it is "appropriate," given the similarity in language, to give the ADA pre-emption provision a similarly broad reading. *Ante,* at 384. In so doing, the Court disregards established canons of statutory construction, and gives the ADA pre-emption provision a construction that is neither compelled by its text nor supported by its legislative history.

I

"In deciding whether a federal law pre-empts a state statute, our task is to ascertain Congress' intent in enacting the federal statute at issue." *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724, 738 (1985) (internal quotation marks omitted). At the same time, our pre-emption analysis "must be guided by respect for the separate spheres of gov-

ernmental authority preserved in our federalist system."
*Alessi* v. *Raybestos-Manhattan, Inc.,* 451 U. S. 504, 522
(1981). We therefore approach pre-emption questions with
a "presum[ption] that Congress did not intend to pre-empt
areas of traditional state regulation." *Metropolitan Life,*
471 U. S., at 740.

Section 105(a) of the ADA provides, in relevant part, "no
State or political subdivision thereof . . . shall enact or en-
force any law . . . relating to rates, routes, or services of
any air carrier having authority under subchapter IV of this
chapter to provide air transportation." 49 U. S. C. App.
§ 1305(a). By definition, a state law prohibiting deceptive or
misleading advertising of a product "relates," "pertains," or
"refers" first and foremost to the *advertising* (and, in particu-
lar, to the deceptive or misleading aspect of the advertising)
rather than to the product itself. That is not to say, of
course, that a prohibition of deceptive advertising does not
also relate indirectly to the particular product being adver-
tised. It clearly does, for one cannot determine whether ad-
vertising is misleading without knowing the characteristics
of the product being advertised. But that does not alter the
fact that the prohibition is designed to affect the nature of
the advertising, not the nature of the product.[1]

---

[1] The court in a similar case arising in New York explained this distinc-
tion well:

"[A]ny relationship between New York's enforcement of its laws against
deceptive advertising and Pan Am's rates, routes, and services is remote
and indirect. In challenging Pan Am's advertising, New York does not
care about how much Pan Am charges, where it flies, or what amenities it
provides its passengers. Its sole concern is with the manner in which
Pan Am advertises those matters to New York consumers. Thus, as far
as New York is concerned, Pan Am is free to charge $200 or $2,000 for a
flight from LaGuardia to London, but it cannot take out a full-page news-
paper advertisement telling consumers the fare is $200 if in fact it is
$2,000. Similarly, Pan Am remains free to route a plane from Ithaca to
Istanbul with as many stops in between as it chooses, but it cannot market
that flight to New York consumers as a 'direct' flight." *New York* v. *Trans
World Airlines, Inc.,* 728 F. Supp. 162, 176 (SDNY 1989); see also *People*

Thus, although I agree that the plain language of § 105(a) pre-empts any state law that relates directly to rates, routes, or services, the presumption against pre-emption of traditional state regulation counsels that we not interpret § 105(a) to pre-empt every traditional state regulation that might have some indirect connection with, or relationship to, airline rates, routes, or services unless there is some indication that Congress intended that result. To determine whether Congress had such an intent, I believe that a consideration of the history and structure of the ADA is more illuminating than a narrow focus on the words "relating to."

## II

The basic economic policy of the Nation is one favoring competitive markets in which individual entrepreneurs are free to make their own decisions concerning price and output. Since 1890 the Sherman Act's prohibition of collusive restrictions on production and pricing have been the central legislative expression of that policy. *National Soc. of Professional Engineers* v. *United States,* 435 U. S. 679, 695 (1978). In 1914 Congress sought to promote that policy by enacting the Federal Trade Commission Act (FTCA), which created the Federal Trade Commission and gave it the power to prohibit "[u]nfair methods of competition in commerce." 38 Stat. 719, codified as amended, 15 U. S. C. § 45(a)(1). That type of prohibition is entirely consistent with a free market in which prices and production are not regulated by Government decree.

In 1938 Congress enacted two statutes that are relevant to today's inquiry. In March it broadened § 5 of the FTCA by giving the Commission the power to prohibit "unfair or deceptive acts or practices in commerce" as well as "[u]nfair

---

v. *Western Airlines, Inc.,* 155 Cal. App. 3d 597, 600, 202 Cal. Rptr. 237, 238 (1984), cert. denied, 469 U. S. 1132 (1985); Note, To Form a More Perfect Union?: Federalism and Informal Interstate Cooperation, 102 Harv. L. Rev. 842, 857 (1989).

methods of competition in commerce." 52 Stat. 111, codified
at 15 U. S. C. § 45(a)(1). Three months later it enacted the
Civil Aeronautics Act of 1938. § 411, 52 Stat. 1003. That
statute created the Civil Aeronautics Board and mandated
that it regulate entry into the interstate airline industry, the
routes that airlines could fly, and the fares that they could
charge consumers.[2] 52 Stat. 987–994. Moreover, the stat-
ute contained a provision, patterned after § 5 of the FTCA,
giving the Civil Aeronautics Board the power to prohibit
"unfair or deceptive practices or unfair methods of competi-
tion in air transportation." 52 Stat. 1003; see also *Ameri-
can Airlines, Inc.* v. *North American Airlines, Inc.*, 351 U. S.
79, 82 (1956). But the Board's power in this regard was not
exclusive, for the statute also contained a "saving clause"
that preserved existing common-law and statutory remedies
for deceptive practices.[3] See 52 Stat. 1027; *Nader* v. *Alle-
gheny Airlines, Inc.*, 426 U. S. 290, 298–300 (1976).

Although the 1938 Act was replaced by a similar regula-
tory scheme in 1958,[4] the principal provisions of the statute
remained in effect until 1978. In that year, Congress de-
cided to withdraw economic regulation of interstate airline
rates, routes, and services. Congress therefore enacted the
ADA "to encourage, develop, and attain an air transportation
system which relies on competitive market forces to deter-
mine the quality, variety, and price of air services." H. R.
Conf. Rep. No. 95–1779, p. 53 (1978). Because that goal
would obviously have been frustrated if state regulations

---

[2] The Civil Aeronautics Board was created and established under the
name "Civil Aeronautics Authority," but was redesignated as the "Civil
Aeronautics Board" by Reorganization Plan No. IV of 1940. See 49
U. S. C. App. § 1321(a)(1) (1982 ed.), repealed effective January 1, 1985, by
49 U. S. C. App. § 1551(a)(3).

[3] Section 1106 of the Civil Aeronautics Act of 1938 provided:

"Nothing contained in this Act shall in any way abridge or alter the
remedies now existing at common law or by statute, but the provisions of
this Act are in addition to such remedies." 52 Stat. 1027.

[4] Federal Aviation Act of 1958, Pub. L. 85–726, 72 Stat. 731.

were substituted for the recently removed federal regulations, Congress thought it necessary to pre-empt such state regulation. Consequently, Congress enacted § 105(a) of the Act, which pre-empts any state regulation "relating to rates, routes, or services of any air carrier having authority under subchapter IV of this chapter to provide air transportation." 49 U. S. C. App. § 1305(a)(1).

At the same time, Congress retained § 411, which gave the Civil Aeronautics Board the power to prohibit "unfair or deceptive practices or unfair methods of competition in air transportation." 49 U. S. C. App. § 1381(a). Congress also retained the saving clause that preserved common-law and statutory remedies for fraudulent and deceptive practices. See § 1506; *Nader*, 426 U. S., at 298–300. Moreover, the state prohibitions against deceptive practices that had coexisted with federal regulation in the airline industry for 40 years, and had coexisted with federal regulation of unfair trade practices in other areas of the economy since 1914,[5] were not mentioned in either the ADA or its legislative history.

In short, there is no indication that Congress intended to exempt airlines from state prohibitions of deceptive advertising. Instead, this history suggests that the scope of the

---

[5] The FTCA does not, by its own force, pre-empt state prohibitions of unfair and deceptive trade practices. Thus, unless a state prohibition conflicts with a Federal Trade Commission rule, state laws and regulations are not pre-empted. See, *e. g., American Financial Services Assn.* v. *FTC*, 247 U. S. App. D. C. 167, 199–200, 767 F. 2d 957, 989–991 (1985); Verkuil, Preemption of State Law by the Federal Trade Commission, 1976 Duke L. J. 225.

Because the Department of Transportation has authority to prohibit unfair or deceptive practices and unfair methods of competition in air transportation, 49 U. S. C. App. § 1381, it, too, could promulgate regulations that would pre-empt inconsistent state laws and regulations. But the Court does not rest its holding on the fact that the state prohibitions of unfair and deceptive advertising conflict with federal regulations; instead, it relies on the much broader holding that the ADA itself pre-empts state prohibitions of deceptive advertising.

prohibition of state regulation should be measured by the scope of the federal regulation that was being withdrawn.

This is essentially the position adopted by the Civil Aeronautics Board, which interpreted the scope of § 105 in light of its two underlying policies—to prevent state economic regulation from frustrating the benefits of federal deregulation, and to clarify the confusion under the prior law which permitted some dual state and federal regulation of the rates and routes of the same carrier. 44 Fed. Reg. 9948, 9949 (1979). The Board thus explained:

> "Section 105 forbids state regulation of a federally authorized carrier's routes, rates, or services. Clearly, states may not interfere with a federal carrier's decision on how much to charge or which markets to serve. . . . Similarly, a state may not interfere with the services that carriers offer in exchange for their rates. . . .
>
> .　　.　　.　　.　　.
>
> "Accordingly, we conclude that preemption extends to all of the economic factors that go into the provision of the *quid pro quo* for passenger's fare, including flight frequency and timing, liability limits, reservation and boarding practices, insurance, smoking rules, meal service, entertainment, bonding and corporate financing . . . ." *Id.*, at 9950–9951.

See also Freeman, State Regulation of Airlines and the Airline Deregulation Act of 1978, 44 J. Air L. & Com. 747, 766–767 (1979).

Because Congress did not eliminate federal regulation of unfair or deceptive practices, and because state and federal prohibitions of unfair or deceptive practices had coexisted during the period of federal regulation, there is no reason to believe that Congress intended § 105(a) to immunize the airlines from state liability for engaging in deceptive or misleading advertising.

## III

The Court finds in Congress' choice of the words "relating to" an intent to adopt a broad pre-emption provision, analogous to the broad ERISA pre-emption provision.  See *ante,* at 383–384.  The legislative history does not support that assumption, however.  The bill proposed by the Civil Aeronautics Board provided that "[n]o State . . . shall enact any law . . . relating to rates, routes, or services in air transportation."  Hearings on H. R. 8813 before the Subcommittee on Aviation of the House Committee on Public Works and Transportation, 95th Cong., 1st Sess., pt. 1, p. 200 (1977).  Yet the Board's accompanying prepared testimony neither focused on the "relating to" language nor suggested that those words were intended to effect a broad scope of pre-emption; instead, the testimony explained that the pre-emption section was "added to make clear that no state or political subdivision may defeat the purposes of the bill by regulating interstate air transportation.  This provision represents simply a codification of existing law and leaves unimpaired the states' authority over intrastate matters." *Id.,* at 243.

The "relating to" language in the bill that was finally enacted by Congress came from the House bill.  But the House Committee Report—like the Civil Aeronautics Board—did not describe the pre-emption provision in the broad terms adopted by the Court today; instead, the Report described the scope of the pre-emption provision more narrowly, saying that it "provid[ed] that when a carrier operates under authority granted pursuant to title IV of the Federal Aviation Act, no State may regulate that carrier's routes, rates or services."  H. R. Rep. No. 95–1211, p. 16 (1978).

The pre-emption section in the Senate bill, on the other hand, did not contain the "relating to" language.  That bill provided, "[n]o State shall enact any law, establish any standard determining routes, schedules, or rates, fares, or charges in tariffs of, or otherwise promulgate economic regulations

for, any air carrier . . . ."  S. 2493, § 423(a)(1), reprinted in S. Rep. No. 95–631, p. 39 (1978).  The Senate Report explained that this section "prohibits States from exercising economic regulatory control over interstate airlines."  *Id.,* at 98.

The Conference Report explained that the Conference adopted the House bill (with an exception not relevant here), which it described in the more narrow terms used in the House Report.  H. R. Conf. Rep. No. 95–1779, pp. 94–95 (1978).  There is, therefore, no indication that the conferees thought the House's "relating to" language would have a broader pre-emptive scope than the Senate's "determining . . . or otherwise promulgate economic regulation" language.[6] Nor is there any indication that the House and conferees thought that the pre-emption of state laws "relating to rates, routes, or services" pre-empted substantially more than state laws "regulating rates, routes, or services."

## IV

Even if I were to agree with the Court that state regulation of deceptive advertising could "relat[e] to rates" within the meaning of § 105(a) if it had a "significant impact" upon rates, *ante,* at 390, I would still dissent.  The airlines' theoretical arguments have not persuaded me that the NAAG guidelines will have a significant impact upon the price of airline tickets.  The airlines' argument (which the Court adopts, *ante,* at 388–390) is essentially that (1) airlines must engage in price discrimination in order to compete and operate efficiently; (2) a modest amount of misleading price advertising may facilitate that practice; (3) thus compliance with the NAAG guidelines might increase the cost of price advertising or reduce the sales generated by the advertise-

---

[6] Because the Court overlooks the phrase "or otherwise promulgate economic regulations" in the Senate bill, see *ante,* at 385–386, n. 2, it incorrectly assumes that the Senate bill had a narrower pre-emptive scope than the House bill.

ments; (4) as the costs increase and revenues decrease, the airlines might purchase less price advertising; and (5) a reduction in price advertising might cause a reduction in price competition, which, in turn, might result in higher airline rates. This argument is not supported by any legislative or judicial findings.

Even on the assumption that the Court's economic reasoning is sound and restrictions on price advertising could affect rates in this manner, the airlines have not sustained their burden of proving that compliance with the NAAG guidelines would have a "significant" effect on their ability to market their product and, therefore, on their rates.[7] Surely Congress could not have intended to pre-empt every state and local law and regulation that similarly increases the airlines' costs of doing business and, consequently, has a similar "significant impact" upon their rates.

For these reasons, I respectfully dissent.

---

[7] They have not demonstrated, for example, that the costs of purchasing the space for the "Restrictions box" required by § 2.1, or the broadcast time to state the two-sentence disclosure required by § 2.2, will have a significant effect on rates. Nor can it realistically be maintained that § 2.7's requirement that words such as "sale," "discount," or "reduced" may only be used if the fare is, in fact, on sale (i. e., is available for a limited time and is substantially below the usual price) will hinder the airlines' ability to market and sell their low-priced fares. Finally, they surely have not proved that § 2.4's requirement that fares be advertised only if sufficient seats are available to meet demand or the extent of unavailability disclosed will make it impossible for the airlines to market and sell different seats at different prices. That section expressly permits the airlines to advertise low-priced fares that are available in limited quantities; it simply requires that they include a disclaimer, such as "This fare may not be available when you call." See National Association of Attorneys General, Task Force on Air Travel Industry, Guidelines § 2.4 (1988), reprinted in App. to Brief for United States as *Amicus Curiae* 24a–25a.