**Trina GARZA, Individually and as Next Friend of Brittany Weir, a Minor, Plaintiff,**

v.

**NORTHWEST AIRLINES, INC., Defendant.**

No. 03–71931.

United States District Court, E.D. Michigan, Southern Division.

Feb. 23, 2004.

David R. Baxter, Esq., Detroit, MI, for plaintiff.

Robert Giroux, Jr., Esq., Southfield, MI, for defendant.

### OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Trina Garza commenced this suit in Wayne County Circuit Court, State

of Michigan, on or around April 23, 2003, asserting claims on her own behalf and on behalf of her daughter, Brittany Weir, arising from the alleged molestation of Brittany by a fellow passenger aboard an August 4, 2001 flight operated by Defendant Northwest Airlines, Inc. Defendant removed the case to this Court on May 19, 2003, citing diversity of citizenship among the parties.

In lieu of answering the complaint, Defendant filed a motion to dismiss on May 27, 2003, arguing that Plaintiff has failed to state a viable negligence claim under Michigan law. In support of this contention, Defendant cites Michigan court decisions holding that premises owners generally owe no duty to protect their business invitees against the criminal acts of a third party. Plaintiff responded to this motion on June 20, 2003, contending that various facts take this case outside the scope of the premises liability law cited by Defendant. Among other considerations, Plaintiff notes that her daughter paid an additional fee to participate in Defendant's "Unaccompanied Minor" program, under which Defendant allegedly promises to supervise child passengers who travel without a parent or guardian. On June 27, 2003, Defendant filed a reply brief in further support of its motion.

The Court conducted a hearing on Defendant's motion on January 22, 2004. Upon considering the arguments of counsel at this hearing, and upon reviewing the parties' written submissions and the record as a whole, the Court now is prepared to rule on Defendant's motion. This Opinion and Order sets forth the Court's rulings.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

Under the present procedural posture, the Court accepts as true the allegations of Plaintiff's complaint. In particular, the Court looks principally to the First Amended Complaint filed on or around April 29, 2003.[1]

On August 4, 2001, Plaintiff Trina Garza's daughter and next friend, Brittany Weir, was a passenger on Defendant Northwest Airlines's Flight No. 1186 from Kansas City, Missouri to Detroit, Michigan. Brittany was 11 years old at the time, and was traveling unaccompanied by her parents or a guardian.

In anticipation that children occasionally will travel without their parents, Defendant has established an "Unaccompanied Minor" program. Under this program, unaccompanied children are charged an additional fee, above and beyond the fare paid by other passengers, in exchange for the promise that they will be "safe and supervised." (First Amended Complaint at ¶ 9.) Plaintiff alleges that Defendant has established this program "for the purpose of encouraging children and families to participate so that Defendant could profit" from such travel. (*Id.* at ¶ 7.) Plaintiff further alleges that Defendant promised "safe and supervised" travel "knowing that people would rely on the[se] representations and pay money to participate in the program." (*Id.* at ¶ 10.)

For her August 4, 2001 flight to Detroit, Brittany Weir enrolled in Defendant's "Unaccompanied Minor" program and

---

**1.** In point of fact, this Court's knowledge of this case is considerably more extensive. Specifically, the Court presided over the criminal trial of the alleged molester of Brittany Weir, Ravichandra Thuluva. In a verdict returned on February 13, 2002, a jury acquitted Mr. Thuluva of all charges brought against him. Nonetheless, for present purposes, the parties and the Court alike have relied almost exclusively—with one limited exception, as addressed below—on the allegations set forth in Plaintiff's complaint.

paid the requisite fee. Plaintiff alleges that Brittany participated in this program in "rel[iance] on all of Defendant's representations and promises"—namely, that Brittany "would have a safe, happy, [and] enjoyable flight under the care and supervision of Defendant's employees." (*Id.* at ¶¶ 11, 14.) Accordingly, when Brittany arrived at the airport that day, she was "placed into Defendant's care, supervision and control." (*Id.* at ¶ 13.)

Upon boarding the plane, Brittany was seated next to Ravichandra Thuluva, a man who was unknown to Brittany or her family. In making this seating assignment, Defendant allegedly failed to place Brittany in a designated section for unaccompanied minor travelers, nor did the airline otherwise seat her in an isolated area of the plane where she could be easily and regularly monitored. (*See id.* at ¶¶ 16, 32(c)-(d).) During the course of the flight from Kansas City to Detroit, Mr. Thuluva allegedly "touched, fondled, molested, assaulted and battered" Brittany. (*Id.* at ¶ 18.) Throughout this alleged assault, Brittany allegedly was left unsupervised and unmonitored by Defendant's flight attendants, and none of Defendant's employees made himself or herself available to Brittany or came to her aid.

Based on this incident, Plaintiff has brought a claim of negligence against Defendant on behalf of her daughter Brittany.[2] Plaintiff's complaint alleges that Defendant breached its duty of due care to Brittany in a number of respects, including: (i) failure to supervise Brittany in accordance with the assurances provided under the "Unaccompanied Minor" program; (ii) failure to place her in a desig-

nated section or otherwise provide for regular monitoring of Brittany during her flight to Detroit; (iii) failure to detect and halt the abuse of Brittany during the flight; (iv) failure to ensure that Defendant's personnel aboard the plane were aware that Brittany was an unaccompanied child and that she required monitoring and supervision; and (v) failure to establish procedures or means for an unaccompanied minor to report problems or seek assistance during a flight. Through its present motion, Defendant argues that the complaint fails to allege a legally cognizable duty under Michigan law, in light of Michigan court decisions holding that a premises owner owes no duty to protect its business invitees against the criminal acts of third parties.

### III. ANALYSIS

#### A. The Standards Governing Defendant's Motion

Through its present motion, Defendant has moved for the dismissal of Plaintiff's state-law negligence claim pursuant to Fed.R.Civ.P. 12(b)(6). In considering a motion to dismiss under this Rule for failure to state a claim upon which relief can be granted, the Court is required to accept as true the well-pleaded factual allegations set forth in Plaintiffs' complaint. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987); *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). However, the Court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan,* 829 F.2d at 12. "Under Rule 12(b)(6), a complaint may be dismissed only if it is clear that no relief could be granted under any set of facts

---

**2.** Plaintiff also asserted a claim on her own behalf, but this claim either has been or soon will be voluntarily dismissed with prejudice.

Accordingly, the balance of this Opinion addresses only Brittany's claim.

that could be proved consistent with the allegations." 829 F.2d at 12 (footnote, internal quotations and citations omitted). The Court will apply these standards in resolving Defendant's motion.

### B. Plaintiff's Negligence Claim Is Not Foreclosed by the Michigan Law of

3. The acts which form the basis for Plaintiff's claim of negligence occurred on a flight between Missouri and Michigan. Nonetheless, under Michigan's choice-of-law rules, which govern this diversity action, *see Muncie Power Products, Inc. v. United Technologies Automotive, Inc.*, 328 F.3d 870, 873 (6th Cir.2003), Defendant maintains that Michigan's substantive tort law provides the standards by which Plaintiff's negligence claim should be judged. *See Sutherland v. Kennington Truck Service, Ltd.*, 454 Mich. 274, 562 N.W.2d 466, 471 (1997) (stating the rule that the Michigan courts will apply Michigan law in tort suits unless there is a "rational reason" to displace it). In response, Plaintiff accepts this analysis, at least for purposes of the present motion. Accordingly, the Court will look to Michigan's negligence law in resolving Defendant's motion.

Before leaving this topic, however, the Court notes that an argument perhaps could be made that federal law governs here, and that Plaintiff's state-law negligence claim has been preempted. Under the Airline Deregulation Act of 1978 ("ADA"), the states are prohibited from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378, 112 S.Ct. 2031, 2034, 119 L.Ed.2d 157 (1992) (describing this provision as intended to "ensure that the States would not undo federal deregulation with regulation of their own"). In light of this statute's broad prohibition against laws "related to" an airline's "price, route, or service," the Supreme Court has rejected the contentions that the ADA "only pre-empts the States from actually prescribing rates, routes, or services," or that "only state laws specifically addressed to the airline industry are preempted," or that "preemption is inappropriate when state and federal laws are consistent." *Morales*, 504 U.S. at 385–86, 112 S.Ct. at 2037–38. Nonetheless, the Court recognized that "[s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner to have pre-emptive ef-

### Premises Liability.

■ Defendant's request for dismissal rests upon the simple premise that it owed no duty to protect or warn Plaintiff's daughter Brittany concerning the criminal acts of third parties. Under Michigan law,[3] a plaintiff must establish, among oth-

fect." 504 U.S. at 390, 112 S.Ct. at 2040 (internal quotations and citation omitted).

More specifically, despite the broad language of the ADA's preemption provision, this and other Courts generally have been reluctant to hold that § 41713(b)(1) preempts personal injury claims based upon a state's common law of negligence. *See, e.g., Burke v. Northwest Airlines, Inc. (In re Air Disaster)*, 819 F.Supp. 1352, 1360–64 (E.D.Mich.1993); *Margolis v. United Airlines, Inc.*, 811 F.Supp. 318, 322–24 (E.D.Mich.1993); *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1264–66 (9th Cir.1998); *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336–40 (5th Cir. 1995). Yet, a split has developed among the Courts of Appeals as to precisely how broadly to construe the ADA's reference to airline "service." *Compare, e.g., Charas*, 160 F.3d at 1265–66 (holding that "service" refers to "such things as the frequency and scheduling of transportation" and "the selection of markets," but not "the pushing of baggage carts, keeping the aisles clear . . ., the safe handling and storage of luggage, [or] assistance to passengers in need"), *with Hodges*, 44 F.3d at 336, 339 (defining "services" more broadly as the "contractual features of air transportation," such as "ticketing, boarding procedures, provision of food and drink, and baggage handling," and contrasting this with non-preempted state tort laws "concerning the operation and maintenance of aircraft"). Under the broader definition, at least, not "all conceivable state tort claims" would be beyond the reach of ADA preemption—*Hodges* cites, for example, cases involving claims that a passenger was wrongfully "bumped" from a flight. *Hodges*, 44 F.3d at 339–40.

If this Court were to adopt the broader reading of § 41713(b)(1), the negligence claim in this case might well be preempted. As discussed in greater detail below, Defendant's "Unaccompanied Minor" program is a principal focus of this case. This seemingly is an airline "service," and it could be argued that the ADA preempts a state tort claim that "relate[s] to" this "service." The Court leaves this question for another day, however,

er elements, that the defendant owed her a legal duty, *see Schultz v. Consumers Power Co.*, 443 Mich. 445, 506 N.W.2d 175, 177 (1993), and the existence of such a duty is a question of law for the court to decide, *see Scott v. Harper Recreation, Inc.*, 444 Mich. 441, 506 N.W.2d 857, 861 (1993); *Williams v. Cunningham Drug Stores, Inc.*, 429 Mich. 495, 418 N.W.2d 381, 383 (1988). In Defendant's view, Michigan law forecloses the existence of any such duty under the facts and allegations of this case, where the criminal act of a third party was an inextricable link in the chain of events that led to the injuries alleged in the complaint.

In arguing for dismissal, Defendant seizes upon the allegation in Plaintiff's complaint that Brittany Weir was "a business visitor and/or invitee on Defendant's airplane," thereby giving rise to a duty to "act with due care and caution for the protection of" this child passenger. (First Amended Complaint at ¶ 31.) Given this apparent appeal to a theory of premises liability, Defendant relies on a recent line of Michigan Supreme Court decisions holding that a business owner generally owes no duty to anticipate and prevent a third party's criminal acts against its invitees.

In particular, the Michigan Supreme Court recently examined the scope of a premises owner's duty in *MacDonald v. PKT, Inc.*, 464 Mich. 322, 628 N.W.2d 33 (2001). In each of the two consolidated cases before the Court, the plaintiff had been struck and injured by sod ripped from the lawn of the Pine Knob Music Theater and thrown by a fellow concert-goer. As to one of these cases, at least, there was ample evidence that sod-throwing was foreseeable—the event coordinator had a policy in place before the perform-

ance dictating the appropriate response to such conduct, evidence was introduced of two prior sod-throwing incidents at this same venue, and the plaintiff was struck during the second episode of sod-throwing in a single evening. Under these circumstances, the lower courts resolved the plaintiffs' premises liability claims under a foreseeability analysis, holding in one case that the sod-throwing incident was foreseeable and in the other that it was not.

The Michigan Supreme Court rejected this analysis, and instead adhered to, and perhaps even extended, its prior decisions sharply limiting a premises owner's duty as to criminal acts on its premises. Specifically, the Court reiterated its ruling in earlier cases that "a merchant has no obligation generally to anticipate and prevent criminal acts against its invitees." *MacDonald*, 628 N.W.2d at 38. The Court explained:

> [W]e have never recognized as "foreseeable" a criminal act that did not ... arise from a situation occurring on the premises under circumstances that would cause a person to recognize a risk of imminent and foreseeable harm to an identifiable invitee. Consequently, a merchant's only duty is to *respond* reasonably to such a situation. To hold otherwise would mean that merchants have an obligation to provide what amounts to police protection, a proposition that we soundly rejected in [prior cases]. To the extent that, in [one of the Court's prior decisions], we relied upon evidence of previous shootings at the bar in assessing whether a reasonable jury could find that the ... plaintiff's injury was foreseeable, we now disavow that analysis ....

because the parties' briefs do not address the issue, but instead agree upon the premise that

Michigan law applies.

A premises owner's duty is limited to responding reasonably to situations occurring on the premises because, as a matter of public policy, we should not expect invitors to assume that others will disobey the law. A merchant can assume that patrons will obey the criminal law. This assumption should continue until a specific situation occurs on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee. It is only a present situation on the premises, not any past incidents, that creates a duty to respond.

Subjecting a merchant to liability solely on the basis of a foreseeability analysis is misbegotten. Because criminal activity is irrational and unpredictable, it is in this sense invariably foreseeable everywhere. However, even police, who are specially trained and equipped to anticipate and deal with crime, are unfortunately unable universally to prevent it. This is a testament to the arbitrary nature of crime. Given these realities, it is unjustifiable to make merchants, who not only have much less experience than the police in dealing with criminal activity but are also without a community deputation to do so, effectively vicariously liable for the criminal acts of third parties.

*MacDonald,* 628 N.W.2d at 39 (citations omitted).

█ Drawing an analogy between its airplanes and ordinary business establishments, Defendant argues that the reasoning of *MacDonald* precludes any recovery here under a premises liability theory. As Defendant correctly points out, the negligence claim asserted in this case arises out of an alleged criminal act by a fellow passenger. Yet, as a matter of general Michigan premises liability law, a business owner owes no duty to its customers to warn or protect against such criminal acts by third parties. Moreover, as *MacDonald* makes clear, this conclusion does not depend upon the foreseeability of criminal activity on the premises. Thus, even if Defendant was or should have been aware of the possibility that its minor passengers might be the target of the criminal conduct that allegedly occurred here, *MacDonald* seemingly precludes any recovery under the premises liability theory that Defendant owed a duty to protect Plaintiff's daughter Brittany against the criminal acts of a fellow passenger.

The question becomes, then, whether Plaintiff's complaint can be read as pursuing theories other than the traditional premises liability claim that *MacDonald* seemingly forecloses. Upon carefully reviewing the complaint, the Court finds a number of allegations which, at least on their face, appear to distinguish this case from the circumstances addressed in *MacDonald.* Accordingly, the Court must determine whether these allegations would support one or more legal theories that are sufficiently distinguishable from the rule established by the Michigan Supreme Court in *MacDonald* and its other premises liability decisions.

At the outset, Plaintiff contends that *MacDonald* is inapposite by virtue of the "special relationship" that existed between her daughter Brittany and Defendant. As Plaintiff acknowledges, Michigan tort law imposes no generalized "duty that obligates one person to aid or protect another." *Williams,* 418 N.W.2d at 383 (footnote with citation omitted). Rather, such a duty arises only "where a special relationship exists between a plaintiff and a defendant." 418 N.W.2d at 383 (footnote with citation omitted). Plaintiff asserts that the requisite "special relationship" came into being in this case as a result of three circumstances: (i) Defendant's sta-

tus as a common carrier, (ii) Defendant's assumption of a duty to care for a child, and (iii) a contractual obligation under Defendant's "Unaccompanied Minor" program.

As Defendant correctly observes, however, the mere existence of such a "special relationship," standing alone, does not necessarily take this case outside the scope of the ruling in *MacDonald*. Contrary to Plaintiff's assertion in her response brief, *MacDonald* and the other Michigan premises liability decisions *also* feature a "special relationship"—as expressly recognized in *Williams*, for example, "[o]wners and occupiers of land are in a special relationship with their invitees and comprise the largest group upon whom an affirmative duty to protect is imposed." *Williams*, 418 N.W.2d at 383. Consequently, while this case might involve special relationships in addition to the owner/invitee relationship addressed in *MacDonald*, Plaintiff still must explain why the reasoning of the Michigan Supreme Court in that case should not apply equally to other types of special relationships. In particular, the Court's observations about the "irrational and unpredictable" nature of criminal activity, and hence the inappropriateness of applying a foreseeability analysis to such activity, seemingly would pertain equally to a business owner or a common carrier. Just as merchants have neither experience in dealing with criminal activity nor a "community deputation to do so," *MacDonald*, 628 N.W.2d at 39, the same can be said about the Defendant airline here.

Nor can the Court accept Plaintiff's contention that *MacDonald* is distinguishable solely by virtue of the degree of control exercised by Defendant over the environment that exists on its airplanes. To be sure, common carriers are presumed to exercise control over their facilities—but this merely gives rise to a "special rela-

tionship" that takes them outside the usual "no duty to protect" rule. *See, e.g., Crase v. City of Detroit*, 341 Mich. 132, 67 N.W.2d 93, 94–95 (1954). Again, this same sort of "special relationship" was present in *MacDonald* and the other premises liability decisions, and gave rise to an analogous duty to protect. It presumably follows, as Defendant argues, that the duties owed by business owners and common carriers alike do not extend to the protection of their customers against the criminal activities of third parties.

Nonetheless, the Court finds that at least one of the "special relationships" identified by Plaintiff suffices to distinguish this case from *MacDonald*. In her complaint, Plaintiff alleges that her daughter Brittany participated in Defendant's "Unaccompanied Minor" program, under which Defendant "represented and promised" that unaccompanied child travelers would be "safe and supervised" in exchange for an additional fee. (First Amended Complaint at ¶¶ 7, 9.) Plaintiff has provided further support for these allegations in her response to Defendant's motion—namely, materials from Defendant's Internet web site that describe the airline's "Unaccompanied Minor" program, including various policies that Defendant has established to "ensure a safe, comfortable and fun trip for the unaccompanied child traveler." (Plaintiff's Response, Ex. 2, reproduction of *http://www.nwa.com/services/onboard/minor.*) These materials also state that participation in the "Unaccompanied Minor" program is mandatory for travelers aged 5 to 14, as Plaintiff's daughter was at the time of the events at issue here, and that this program "provide[s] supervision for children accepted under the program from the time of boarding until the child is met at the final destination." (*Id.*) Finally, these materials confirm the complaint's allegation that Defen-

dant charges a fee for this service—at the time, $40 each way.[4]

*MacDonald* does not address this set of circumstances, in which a merchant itself has established different categories of customers, has promised different types and degrees of service among these classes of customers, and has charged different fees for these services. The customers in *MacDonald* were all alike—none had been singled out by the premises owner, whether through payment of an additional fee or otherwise, as requiring special treatment or extra attention, and the Michigan Supreme Court rejected the notion that any of these customers were either more likely to engage in criminal activity or more likely to fall victim to such conduct. By contrast, if a merchant itself creates a separate class of customers from whom it demands additional compensation in return for enhanced services—*e.g.*, additional supervision, monitoring, and security—it has thereby assumed additional legal responsibilities toward this special class of invitees. Assuming a different set of facts in *MacDonald*, for example, if the owner of the entertainment venue had offered a special seating section, promising additional security and protection in return for an enhanced fee, this Court is confident that the Michigan Supreme Court would have recognized the *quid pro quo* nature of the special relationship that existed between the owner and this select group of customers.

In a related argument, Plaintiff asserts, and the Court again agrees, that notions of *in loco parentis* further distinguish this case from *MacDonald*. The Michigan courts have held, for example, that "[a]t least in a limited sense the relation of a teacher to a pupil is that of one in loco parentis," so that the teacher is "bound to use reasonable care" to protect the students in her custody. *Gaincott v. Davis*, 281 Mich. 515, 275 N.W. 229, 231 (1937). Plaintiff argues that an analogous relationship exists here between Defendant and its unaccompanied child passengers, where Defendant explicitly assures parents, through its "Unaccompanied Minor" program, that it will provide at least some approximation of the supervision that the parents themselves would supply if they were to fly along with their children.

As explained earlier, this special relationship alone does not remove this case from the reach of *MacDonald*. Yet, in a case cited by Plaintiff, *Phillips v. Deihm*, 213 Mich.App. 389, 541 N.W.2d 566, 573 (1995), the Michigan Court of Appeals held that the defendant wife of a sexual predator, the plaintiff's grandfather, was subject to tort liability under a statutory equivalent to the *in loco parentis* doctrine, where the wife had failed to intervene in the grandfather's sexual abuse of the plaintiff over an eight-year period. In so ruling, the Court noted the "general rule" that "there is no duty to protect against the criminal acts of a third person," but nonetheless found that "a person over eighteen years of age who is responsible for a child," within the meaning of a Michigan statute, "has a duty to act reasonably to prevent the sexual abuse of that child." *Phillips*, 541 N.W.2d at 573.

4. The Court recognizes that these materials exceed the scope of the complaint, and thereby would seemingly require that the Court treat Defendant's motion "as one for summary judgment" which must be "disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b). Yet, the above-quoted statements from Defendant's web site are largely duplicated, if perhaps not verbatim, in the allegations of Plaintiff's complaint, and the Court has cited these statements merely to illuminate these allegations. Thus, the Court does not believe that its limited reference to these outside materials necessitates the re-characterization of Defendant's motion into one governed by Rule 56.

Because *Phillips* was decided before *MacDonald*, the continued vitality of this earlier decision could perhaps be questioned. Yet, it could also be argued that the special relationships of business owner/invitee and *in loco parentis* are qualitatively different, so that the limits imposed in *MacDonald* do not invariably carry over from the former to the latter. *Cf. Scott, supra*, 506 N.W.2d at 863 n. 15 (reserving the question whether the principles addressed in the premises liability case before the Court should apply equally to "the area of landlord-tenant law"). In any event, no subsequent decision has held, or even suggested, that the ruling in *Phillips* is no longer good law in light of *MacDonald*. This decision by an intermediate appellate court serves as "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Ziebart International Corp. v. CNA Insurance Cos.*, 78 F.3d 245, 250–51 (6th Cir.1996) (internal quotations and citations omitted). Defendant has not provided any such "persuasive data" indicating that the Michigan Supreme Court would reject the ruling in *Phillips*.

█ Indeed, the very existence of Defendant's "Unaccompanied Minor" program suggests the airline's recognition of the necessity of at least some limited *in loco parentis* role when children are traveling alone on its airplanes. As noted, this program is mandatory, not optional, for children the age of Plaintiff's daughter at the time of the events at issue here. Thus, a minor passenger is *compelled* to pay more than an adult in order to travel on the very same flight, presumably so that Defendant can provide the additional services and cover the additional costs associated with a child flying alone. This plainly reflects Defendant's own judgment that its responsibilities and obligations are greater for children than adult passengers. It seems eminently reasonable, in this Court's view, to expect that Defendant will discharge these heightened obligations—which are not merely voluntarily assumed, but mandatorily imposed upon child passengers—with the reasonable care demanded under Michigan tort law.

If Defendant is reluctant to assume this elevated *in loco parentis* role with respect to unaccompanied minors, it may exercise its business discretion and insist that children must travel with a parent or guardian, or that parents must sign some form of liability waiver before their children will be permitted to travel alone.[5] Defendant has exercised precisely the opposite business judgment, however, agreeing to assume responsibility for unaccompanied child passengers in exchange for an additional fee. This circumstance, in this Court's view, removes this case from the ambit of the traditional premises liability rulings of the Michigan courts. Through its "Unaccompanied Minor" program, Defendant has itself established a distinct class of passengers, separate and apart from its adult travelers. If this latter group of passengers is properly analogized to business invitees under Michigan's premises liability law, the former class of child travelers presumably is owed greater obligations—at a minimum, the additional supervision seemingly promised by Defendant in exchange for a higher fare. Having voluntarily chosen to adopt such an arrangement, and having accepted Plaintiff's daughter into this program, Defendant was obligated under Michigan law to

---

5. The Court expresses no view, of course, regarding the effectiveness or legality of such a measure.

perform its voluntarily assumed duties with due care.

In citing this voluntarily assumed obligation, the Court recognizes that its ruling here implicates a Michigan decision that the parties have cited but failed to address at any length in their briefs. Specifically, in *Scott, supra*, the defendant night club operator advertised that it offered "Free Ample Lighted Security Parking." *Scott*, 506 N.W.2d at 858. As the plaintiff left the defendant's establishment one evening and walked to his car in the club parking lot, he was shot six times by an unidentified gunman. Based on the assurances regarding "security parking," the plaintiff argued, as Plaintiff also does here, that the defendant was liable for negligently performing a duty it had voluntarily undertaken.

The Michigan Supreme Court rejected this claim, finding that the defendant had provided all that it promised:

> . . . [T]he defendant did not advertise that it would "make the parking lot safe" or provide a "lot free of criminal activity"—it never claimed the ability or the intention to create an environment that was guaranteed to be free of crime. The defendant instead advertised specific security measures designed (a) to decrease the likelihood of crime, and (b) correspondingly to decrease the anxiety felt by patrons. Indeed, because the defendant put in place each promised security measure, it is reasonable to assume that it *did* reduce the incidence of crime in its parking area.

> Common sense is required in approaching a case like this. A promise to take specific steps to reduce danger is a promise to do just that—not a promise to eliminate the danger. Manufacturers of safety equipment, for instance, normally promise, expressly or by implication, that the danger of injury will be *reduced*—rarely, if ever, do they promise that all danger of injury will be eliminated. Likewise, neither this defendant's advertising nor the measures it put in place constituted a guarantee of the plaintiff's personal safety.

*Scott*, 506 N.W.2d at 862 (footnotes omitted). To hold otherwise, in the Court's view, would "penalize merchants who provide some measure of protection" whenever such measures failed to altogether "prevent all criminal activity on [their] premises." 506 N.W.2d at 862 (citations omitted). More generally, the Court found on "public policy" grounds that "a promise to guarantee the personal safety of another cannot be inferred from circumstances or from ambiguous representations." 506 N.W.2d at 862 n. 12.

While *Scott* is undeniably relevant here, the Court's ruling in that case rested in large measure upon the fact that the defendant business owner had provided precisely what it had promised. Notably, the Court "offer[ed] no view regarding other factual situations that might arise, such as where an important safety measure is specifically promised and is entirely absent, and injury is proximately caused thereby." *Scott*, 506 N.W.2d at 863 n. 16. Thus, *Scott* is wholly consistent with other Michigan cases holding that "when a person voluntarily assumes the performance of a duty, he is required to perform that duty carefully." *Terrell v. LBJ Electronics*, 188 Mich.App. 717, 470 N.W.2d 98, 99–100 (1991). In holding that the defendant night club owner was entitled to judgment in its favor, the *Scott* Court found as a matter of law that the owner had reasonably performed the task it had voluntarily assumed—that is, to provide "free ample lighted security parking."

*Scott* principally illustrates, in this Court's view, that a criminal act alone is not sufficient to demonstrate a lack of due

care. In that case, in particular, the criminal assault on the plaintiff did not establish the defendant's negligence in providing "security parking." More generally, the Michigan Supreme Court was concerned that a plaintiff might cite a business owner's voluntary security measures in an "attempt to circumvent" the rule, as established in *Williams* and reaffirmed in *MacDonald,* that "merchants are ordinarily not responsible for the criminal acts of third persons." *Scott,* 506 N.W.2d at 863. To avoid such an end-run around this rule, the Court held that "[s]uit may not be maintained on the theory that the safety measures are less effective than they could or should have been." *Scott,* 506 N.W.2d at 863 (footnote omitted). Through this ruling, the Court plainly sought to ensure that all business owners are treated alike as to third party criminal activity on their premises, without regard for whether they provide some limited security measures for their customers.

This case, in this Court's view, does not pose a similar danger of an "attempt to circumvent" the usual Michigan rule of non-liability for criminal acts of third parties. Plaintiff has not sought to manufacture a distinction between Defendant and other airlines or between Brittany and other passengers. Rather, Plaintiff relies on a distinction made *by Defendant itself* between its adult passengers and unaccompanied child travelers. As explained earlier, Defendant is not only aware of the distinct obligations attendant to children traveling alone, it has affirmatively required that this class of passengers pay more in order to obtain this additional layer of necessary services. Defendant's conduct in this case is not being measured by an external set of standards for reasonable care and protection of its business invitees in general, nor is Defendant being judged in hindsight for alleged deficiencies in security measures that it voluntarily and

gratuitously provided. Instead, Plaintiff's theory of recovery rests upon Defendant's specific promise of additional supervision for a select subset of special-needs passengers, who have been assessed a separate fee in exchange for these required services.

In addition, the allegations here can be read as presenting precisely the situation that the *Scott* Court specifically declined to reach. In particular, Plaintiff's complaint alleges *both* that Defendant assumed a voluntary duty to supervise its unaccompanied minor passengers, (*see* First Amended Complaint at ¶ 9), *and* that Defendant failed to perform this task throughout the duration of Brittany's flight to Detroit, (*see id.* at ¶ 19). These allegations can reasonably be read as asserting that Defendant promised to supervise Brittany as a participant in its "Unaccompanied Minor" program, but that this "important safety measure," *Scott,* 506 N.W.2d at 863 n. 16, was either entirely absent or, at a minimum, lacking during a substantial portion of Brittany's travel. The Court finds that this alleged lack of a promised security measure is sufficient to distinguish this case from *Scott,* and to state a claim under the "voluntary undertaking" theory of liability recognized by the Michigan courts.

This ruling, in the Court's view, is entirely consistent with both the reasoning and result in *MacDonald,* because it does not rest upon the premise that Defendant should have foreseen the alleged criminal assault on Plaintiff's daughter. Presumably, Defendant promises to supervise its unaccompanied minor passengers in order to address the entire panoply of situations that might arise during air travel—a flight delay or cancellation, for example, or the late arrival of the person designated to meet the child at his or her destination. If, under *MacDonald,* Defendant is not obliged to provide something tantamount

to police protection to ensure the safety and well-being of its unaccompanied minor passengers, neither is it true that Defendant should be exempt from liability merely by virtue of the happenstance that its alleged lack of supervision created the opportunity for criminal activity, as opposed to some other sort of misfortune. Stated differently, just as *Scott* established that criminal activity is not *per se* evidence of a lack of due care, the involvement of criminal activity in a case does not *per se exclude* the imposition of tort liability. While "[a] merchant can assume that patrons will obey the criminal law," *MacDonald*, 628 N.W.2d at 39, this does not excuse a merchant's—or, by analogy, a common carrier's—failure to perform a duty that it has specifically and voluntarily undertaken for a fee, even in cases where a criminal act is interposed between this failure and the plaintiff's injury.

Finally, it bears noting that *MacDonald* itself does not altogether preclude any premises liability claim in cases involving a third party's criminal conduct. Rather, the Michigan Supreme Court held that a business owner's obligation is limited to "respond[ing] reasonably to criminal acts occurring on the premises." *MacDonald*, 628 N.W.2d at 39. This duty is "triggered by specific acts occurring on the premises that pose a risk of imminent and foreseeable harm to an identifiable invitee." 628 N.W.2d at 40–41. The Court further explained that this duty entails making "reasonable efforts to contact the police"—or, stated differently, to "reasonably expedite the involvement of the police" in the criminal activity occurring on the premises. 628 N.W.2d at 39–40.

The Court reads the complaint as alleging that Defendant breached even this more limited duty. Specifically, apart from alleging more generally that Defendant failed to properly supervise Brittany and the passenger seated next to her, and to monitor her at regular intervals to ascertain whether she was experiencing any difficulties, Plaintiff has alleged that Defendant "fail[ed] to identify the abusive conduct by the perpetrator once it started during the flight," and that its employees negligently "[a]llowed the perpetrator to be alone with [Brittany] long enough to molest, touch, assault, batter, intimidate, and scare" her. (First Amended Complaint at ¶¶ 32(g), 32(k).) The complaint also charges that Defendant negligently failed to provide any "method or means for unaccompanied minors . . . to communicate problems or dangers that arise during the course of a flight," but instead "[c]reat[ed] an environment that . . . hindered [Brittany's] attempts to get help." (*Id.* at ¶¶ 32(h), 32(m).)

■ These allegations, if supported by evidence, could permit a reasonable trier of fact to conclude that Defendant breached its limited duty to expedite the involvement of law enforcement authorities in the criminal activity allegedly perpetrated by Brittany's fellow passenger. Although *MacDonald* does not require that a premises owner prevent any third-party criminal acts against its invitees, it does mandate that the owner must respond reasonably to such conduct on its premises by making efforts to alert the authorities. This ruling seemingly allows for the possibility that a business owner could be held liable for negligently turning a blind eye to ongoing criminal activities on its premises. Such an owner surely does not respond appropriately if it unreasonably fails to even observe the events that trigger its duty—namely, "specific acts occurring on the premises that pose a risk of imminent and foreseeable harm to an identifiable invitee." *MacDonald*, 628 N.W.2d at 40–41.

The complaint in this case alleges this form of negligence, claiming that Defendant's inadequate supervision and monitoring of Plaintiff's daughter created a situation in which a fellow passenger was able to carry out an ongoing molestation and assault without detection or intervention by anyone in a position of authority. This alleged failure to discern and respond to criminal conduct is all the more problematic under the circumstances presented here, where the alleged victim was in the captive environment of an airplane, and thus could neither flee from her alleged assailant nor contact the law enforcement authorities on her own behalf. *See Vantassell–Matin v. Nelson,* 741 F.Supp. 698, 705–06 (N.D.Ill. 1990) (noting that, unlike patrons of more traditional business establishments, "airline passengers have *no one* other than members of the flight crew to call upon to protect them from [criminal] activity and no way to protect themselves by simply leaving" (footnote omitted)). Indeed, the complaint affirmatively alleges that Defendant negligently failed to provide any means for minor passengers to seek assistance in addressing dangers or threats that arise in flight.

The Court finds that these allegations, if proven, would support a viable claim under Michigan law that Defendant negligently failed to respond reasonably to specific criminal conduct aboard its plane that imminently threatened the well-being of one of its passengers. Apart from this theory of recovery, which is expressly recognized in *MacDonald,* the Court also has ruled that the special relationship created through Brittany's enrollment in Defendant's "Unaccompanied Minor" program provides an additional basis for the imposition of liability. In light of these viable theories that find support in the allegations of Plaintiff's complaint, the Court holds that Plaintiff's negligence claim is not foreclosed as a matter of law under the premises liability rulings of the Michigan courts.

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's May 27, 2003 Motion to Dismiss is DENIED.